DAVID COLDEN MURRAY, receiver &c., *vs.* CORNELIUS VANDERBILT.

Although the Rivas-Walker government, in Nicaragua, was not recognized by the United States in February, 1856, when that government made a decree annulling and revoking the charter of the Accessory Transit Company, yet such decree still remaining in force and being enforced by the government of Nicaragua, in May, 1856, when that government was recognized by the United States; *Held* that from the latter period, at least, if not from the time of its date, the decree must be considered as a valid act of the government of Nicaragua.

*Held, also,* that, if the decree was not void at the time of its passage, the recognition of the government by the United States in May, 1856, would have a retro-active effect, so as to give validity in this country to the decree previously made, so far as to enable the courts here to act on it as affecting the charter.

Considering that decree as valid its effect was not such as absolutely to dis-

Murray *v.* Vanderbilt.

solve the company, and make a service of process on its officers void; but it left the corporation still in existence, for certain purposes.

And the corporation being still in existence, a receiver could derive title to its property, under proceedings instituted against the corporation by creditors.

No power can be exercised by the supreme court, over a foreign corporation, in proceedings commenced by a stockholder, to wind up its affairs.

But, for the purpose of preserving the property of such corporation, for the benefit of creditors or stockholders, a court of equity has ample power to take charge of it, and to appoint a receiver.

An appearance of a corporation, by officers of the court, will be valid and give jurisdiction, whether the service of process upon its officers be good, or not; provided the corporation is still in existence.

Where the president and secretary of a corporation executed an assignment of its property, and attached the seal of the company thereto, without any specific authority from the company to do so; *Held* that it was not a proper execution of the instrument; and that the want of authority on the part of the officers could not be cured by any proof of execution made before the commissioner.

An agreement was made between the Pacific Mail Steamship Company and the Accessory Transit Company, by which the former company was to pay to the latter a certain sum per trip, or per month, so long as the boats of the Pacific Company should run without opposition. *Held* that in an action brought by the Transit Company against the Pacific Company, although the contract was immoral and in restraint of trade and commerce, the court would not enforce it against the delinquent party, or, if the money had been paid, enable the party paying to recover it back, but would leave the parties as the law found them; both being *in pari delicto*. Yet that the rule did not apply to an action by one of the principals in such a contract, against its agent who had received money thereon.

Money having been paid voluntarily, to an agent, for his principal, by a party who could not have been compelled to make such payment, it becomes the property of the principal, in the agent's hands, for which the agent should account. He has no right to refuse payment to his principal because the latter had not a legal claim to the money paid.

An agent has no right to dispute the title of his principal to moneys received by him for the use of the principal. Nor can he resist an action for the amount so received, on the ground that the money was paid on an illegal contract between the original parties.

After a corporation has virtually ceased to exist, and for all purposes of business, and for promoting the objects of the charter, all its powers have been taken away, its property all expended, and the company is hopelessly insolvent, it is not improper for the president of the company to enter into arrangements on his own behalf, for carrying on and continuing for his own benefit the business formerly conducted by the company, under an

agreement not imposing any duty or obligation upon the corporation, or involving any use of its property.

The being president of an insolvent corporation will not prevent one from doing what the corporation has lost all ability to do. After the company has virtually ceased to exist, and its powers have been taken away, the reason and policy of the rule prohibiting a trustee from making agreements for his own benefit, ceases also.

Where the president of a corporation, holding a mortgage upon vessels of the corporation, given to secure him for advances made, and for bonds of the company held by him, and authorized by the company to sell the vessels as its agent, sold the same, at private sale, to his son, taking his note for the purchase money, payable in a year, he still keeping the control and management of the vessels and rendering no account to the purchaser for the use of them; *Held* that such a transaction could not be upheld; and the sale was ordered to be set aside, and the agent directed to account to the company for the proceeds of the vessels, when subsequently sold by him.

THIS was an action for an accounting by the defendant. The facts appear in the opinion of the court.

*A. J. Parker, Henry A. Cram* and *John Sherwood,* for the plaintiff.

*H. F. Clark, C. O'Conor, Daniel Lord* and *Charles A. Rapallo,* for the defendant.

INGRAHAM, J.   This action is brought by the plaintiff, as receiver, appointed in various actions against the Accessory Transit Company for the collection of debts due from the company.   The first was in an action of the Pennsylvania Coal Company, commenced about the 30th of March, 1858, founded upon a judgment recovered on the 21st day of November, 1856, and setting forth the insolvency of the company, the issuing of an execution, and its return unpaid; that the company had a large amount of property in New York which could not be reached by execution, and praying that a receiver be appointed, and that judgment be rendered that the corporation be dissolved.   This action was commenced by service of the summons on the secretary of the company on the 27th of October, 1856.   In May, 1858, an

order was made at special term for the appointment of a receiver, and the plaintiff was so appointed on the 31st of May, 1858.

The second was by George Hussey and others, plaintiffs, against the Company, commenced in June, 1856, by service of a copy of summons on the secretary, founded on a judgment recovered on the 20th of December, 1856; and in October, 1858, an order was entered for the appointment of a receiver, and the plaintiff was again appointed receiver in October, 1858.

The third was in an action by Edward M. Robinson and others *v.* The Accessory Transit Company, commenced in May, 1858, founded upon a judgment recovered December 20, 1856, in an action commenced in November, 1856, by service of summons on the secretary of the company. In this action the defendants appeared by attorney, and on the 27th of December, 1858, the plaintiff was appointed receiver.

The fourth was in an action by James S. Sandford and others *v.* The Accessory Transit Company, commenced in October, 1858, founded upon a judgment recovered the second of December, 1856, in an action commenced on the 10th of November, 1856, by service of summons on the secretary of the company.

On the 6th of November, 1858, an order was made for the appointment of a receiver, and on the 18th of January, 1859, the plaintiff was appointed receiver. Subsequently other actions were brought and judgments recovered, and similar orders were made appointing the plaintiff as such receiver. In December, 1858, an action was commenced by George C. Anthon, a stockholder of the company, in behalf of himself and all other stockholders of the company, setting out the recovery of the judgments; the insolvency of the company; that the company had property in the state; that the state of Nicaragua had by a decree dated 18th of February, 1856, professed to annul and revoke the charter, and had taken possession of the property of the company, and asking the

appointment of a receiver to take the property and distribute the same among the creditors and stockholders of the company. No appearance was entered for defendants in that action, and on the 12th day of January, 1859, an order was entered appointing the plaintiff receiver therein. Under the order made in the action of Sandford and others, James M. Cross, as president of the company, and L. Wardell, as secretary, executed an assignment to the receiver, of all the effects of the company, to which was annexed the seal of the company; and there was also attached a certificate of a commissioner of deeds, that the same was duly executed by the president of the company.

On the 27th of January, 1859, the plaintiff obtained leave to bring this action. In his complaint the receiver sets up his title under the judgments before stated, and under the assignment, and avers that the company was incorporated under the laws of Nicaragua, and had an office for the transaction of business in New York. That prior to January, 1856, the company was engaged in a profitable business in transporting passengers and freight across the isthmus of Nicaragua, and to New Orleans and elsewhere. That the company owned large and valuable steamers and lake boats, and other property necessary for such business. That the value of the property was large, and its business was profitable. That on the 3d of January, 1856, the defendant was appointed general agent of the company, and on January 30, 1856, was elected president of the company. That on February 18, 1856, a decree was issued by Rivas, claiming to be the president of the state of Nicaragua, under which decree the property of the company on the isthmus was seized and taken from the company, and its operations from that time suspended. That in March, 1856, further powers were conferred upon the defendant as agent and president, to do all such acts as were necessary to extricate the company from its difficulties and restore its rights. That under such agreement the defendant made a contract with

Murray *v.* Vanderbilt.

the Pacific Mail Steamship Company for the payment of $40,000 per month to the company, so long as no line should be run to and from New York and San Francisco by the company in opposition to the Pacific Mail Steamship Company. That the agreement had continued in force down to the commencement of the action; and that the defendant had received under it over $1,200,000. That the defendant, acting as president, accounted for and paid over to the company $40,000; and alleging that the residue had not been paid, but was wrongfully retained by the defendant. The complaint also charged that the defendant had received large sums for coal and other property, and for freight and passage moneys, which he had not paid over. The complaint also charged upon the defendant a fraudulent scheme or plan to divest the company of its property, and to acquire the same for his own use, and enumerated various acts done by the defendant for that purpose, among which were the retaining to his use the subsidy from the Pacific Mail Steamship Company, the execution of mortgages upon the ships, and the sales of the ships at an amount below their value, the sale of a portion of the ships to his son at a low price, for his own use, and improper charges in his accounts. The plaintiff asks for an accounting as to these various matters, and a decree that the plaintiff may recover the amount that shall be found to be due.

The defendant in his answer denies the right of the plaintiff to maintain this action, and his authority to act as receiver, as well as the various charges made against him in the complaint. He claims the subsidy as belonging to himself and not to the company, and alleges that he has fully accounted to the company. He also denies all frauds, as alleged in the complaint, and insists, as a defense, that there is a defect of parties to the present action.

The question which is raised as to the plaintiff's title, was made when the plaintiff rested, on a motion to dismiss the complaint, and was again renewed at the close of the case.

The decision of this question rests upon the validity and effect of the decree of the Nicaragua government of February 18, 1856. This decree was made by the Rivas-Walker government, which was not recognized by the United States until May, 1856. Although not recognized when the decree was made, yet at the time of recognition in May, the decree still remained in force, and was enforced by that government. From the time of the recognition of the government in May, at any rate, if not from its date, that decree must be considered as a valid act of the government of Nicaragua ; and I am of the opinion that where the decree was not void at the time of its passage, the recognition of the government in May would have a retro-active effect, so as to give validity in this country to the decree made previously, so far as to enable the courts here to act on it as affecting the charter. The case of *Ogden* v. *Folliott*, (3 *Tr. Rep.* 726,) which was relied on as authority against this position, is not applicable. There the party sought to be affected by a decree of confiscation in New York, during the Revolution, had returned to England, and acquired rights there in opposition to the confiscation, which could not be taken away in England by a treaty of peace and recognition of the government afterwards. A similar ruling was made in *Kennett* v. *Chambers*, (14 *How. U. S. Rep.* 38,) founded in like manner upon the agreement being void when made, and therefore deriving no force from subsequent recognition. That this decree annulled the charter and deprived the corporation of its corporate powers for all purposes except that stated in the decree, would seem to me, in the absence of contrary decisions, to be the proper construction to be given to it. And the commencement of actions and service of process on officers of the company, when there had been no election for directors or officers for two years, with the fact, as proved, that the whole business of the corporation had been suspended and the property sold by the sheriff, appears to me to have been a nullity, so far as it is relied on as the com-

Murray *v.* Vanderbilt.

mencement of an action to give jurisdiction over the company. But it is unnecessary for me to examine this point more at length, because I feel bound by the decision of the general term of this district, in regard to this company, in which they held that the company was not dissolved by the decree. (*Hamilton* v. *Accessory Transit Co.,* 26 *Barb.* 46, 49.) Mitchell, P. J. says : " If we are bound to recognize that decree as to the rights of the company to be enforced here, or as to its property here, and to adopt the whole decree, we must consider the company as still in existence." If the company is considered as still in existence, then the objection of the defendant to a want of title in the plaintiff as receiver in the actions brought to recover debts due from the company, falls to the ground.

In regard to the proceedings by a stockholder to wind up the affairs of the company, no such power can be exercised over a foreign corporation. The only provision of our laws in regard to such proceedings against corporations limits them to corporations incorporated by a law of this state, and there is no provision by which a stockholder can thus proceed in this state against the corporations incorporated by other states. But for the purpose of preserving the property for the benefit of creditors or stockholders, I think a court of equity has ample power to take charge of it and to appoint a receiver. This undoubtedly is the rule in regard to domestic corporations, independent of any statutory provisions. Such was the case in *Lawrence* v. *The Greenwich Fire Insurance Co.,* (1 *Paige,* 587.) There the bill alleged that the corporation was dissolved, and had no officers to attend to its concerns. The chancellor said "it was evident there was no person authorized to take charge of, or to conduct the affairs of the corporation. Under these circumstances, it was proper to appoint a receiver to take charge of the effects of the company and preserve them for the benefit of the stockholders generally." The amendment of the 244th section of the code, applying the appointment of receiver

to like cases of foreign corporations with those which existed in the case of other corporations, would extend this power to the present case, if any doubt existed prior thereto.

Although, therefore, in the proceeding by Anthon as a stockholder, the plaintiff may have asked for a greater relief in the complaint than could be granted, still he showed facts enough to warrant the appointment of the receiver, and the taking possession of the property to preserve it for the benefit of those entitled thereto. It is, however, immaterial whether or not the suit of Anthon against the Accessory Transit Company was one which could be maintained or which could give the court jurisdiction to appoint a receiver. The other actions were commenced for the recovery of debts; the summons in each case was served in the manner prescribed by law, and under the decision before referred to, whatever may be my individual opinion on this question, I must hold that the company was not so deprived of existence by the decree of the Nicaragua government as to make the service of process on its officers void.

Independent of this service, in some of the cases the defendants appeared by officers of this court, and such appearance would be valid and give jurisdiction, whether the service was good or not, if we are to regard the corporation as still in existence, notwithstanding the decree of February, 1856.

The plaintiff's title also rests upon an assignment made to him by the supposed officers of the company, as such receiver, under an order of the court directing such assignment. I cannot, however, under the evidence in this case, consider that instrument as having any validity from its execution. This assignment was dated on the 18th of January, and executed on the 19th of January, 1859, and purported to have been signed by Cross as president and Wardell as secretary, and the execution appears to have been proven by Cross. The seal affixed to the instrument was the seal of the company, and the commissioner certifies that Cross testified that

Murray *v.* Vanderbilt.

the seal was affixed by the authority of the company. This would be *prima facie* evidence of its execution, but subject to contradiction by other testimony.

The evidence shows that after the decree of the Nicaragua government, taking away the charter, in February, 1856, there were two elections of directors or officers, one on the 5th of May, 1856, and one on the 4th of May, 1857, when Cross was elected president from the 1st of June, 1857. From that time he commenced to act, and appears to have been considered by strangers as the president. But there was no proof of any authority being given to execute the paper, and his testimony conclusively shows that he had no specific authority from the company to execute any assignment, even if under the circumstances he should be recognized as the president. The affixing of the seal of the company, which in fact was the real execution of the paper, if it was executed, was also without authority. There could be no authority given, because there was no meeting of the board for that purpose. The seal was found attached to the press, and the testimony shows it had been sold by the sheriff, so attached with the press, and bought in by Mr. Cross. Such a transaction can never be considered to be a proper execution of a sealed instrument by a corporation; and the want of authority on the part of the officers cannot be cured by any proof of execution made before the commissioner. Cross states that no such proof was furnished, and there is no evidence to the contrary, except the commissioner's certificate. I consider this assignment as invalid, and executed without authority. It therefore confers no title on the receiver, if he did not obtain such title by virtue of his appointment as such in the actions before referred to.

I will now examine the various claims set up by the plaintiff, for which he asks a judgment directing an accounting against the defendant.

1st. The plaintiff, as receiver, claims to recover against the defendant for moneys received by him from the Pacific Mail

Steamship Company for a subsidy agreed to be paid by that company for laying up the steamers belonging to the Transit Company. As to the terms of the contract or agreement there is but little if any difference between the parties. It was a verbal agreement made between Mr. Vanderbilt on the one side and Mr. Aspinwall on the other. They at the time were presidents of the two companies. Mr. Aspinwall says he proposed to pay either to Mr. Vanderbilt or to his company a certain sum per trip for each trip that the boats of the Pacific Mail Steamship Company ran without opposition, which was agreed to by the defendant. The amount to be paid was $10,000 per trip. This is the substance of the agreement, as stated by Mr. Chauncey, who was present. Mr. Vanderbilt states the terms of the contract to be in substance the same, except that the Pacific Mail Steamship Company was to pay $40,000 per month, on condition that they should have no opposition; making the payment per month instead of per trip. The point of difference between the plaintiff's witnesses and the defendant is, as to the party who was to receive this payment.

Without specially recapitulating the testimony in reference to this part of the case, I think the whole of the evidence, taken together, shows the intent of the parties making the agreement at that time was, that the subsidy should go to the benefit of the Transit Company. The testimony of Mr. Aspinwall shows that such was his understanding of the agreement. This is confirmed by Mr. Chauncey, who was present, and who says the payment was to be for withdrawing the ships of the Transit Company. Some of the receipts given for the first payments, signed by Mr. Allen, prior to the 11th of June, purported to be for money due the Accessory Transit Company. The receipt given on the 11th June, signed by the defendant, was for money due the Accessory Transit Company. The fact that the vessels of the company were laid up after the agreement, and the directions given to Templeton, the agent at New Orleans, to that

effect, the account rendered by Vanderbilt to the company, containing credits for the money received from the Pacific Mail Steamship Company prior to June, 1856, and charges for such commissions on such credits; the fact that the defendant knowingly allowed the company the benefit of these payments when first made; and the exertions made by the defendant to obtain a restoration of the privileges to the company, which had been taken away by the government of Nicaragua, and in which he hoped to succeed — all lead me to the conclusion that when this agreement was first made between the parties, it was intended for the benefit of the Accessory Transit Company, and that such understanding was carried out by Allen, as the agent of the defendant, in the receipts given and accounts rendered, and by the defendant himself, down to the period when the agreement was terminated in June, or July, by an opposition being run by Morgan & Garrison. I have not deemed it necessary to advert to the contradictions in the testimony on this branch of the case, for the reason that such contradictions are very easily accounted for by the lapse of time which has taken place since those conversations. After the expiration of six years, a conversation such as that was can hardly be expected to be repeated as it took place. In fact, all the witnesses do not pretend to give the exact language, but only the substance. Under such circumstances, without imputing to any witness the least intention to misstate what took place, I think much more reliance may, and should be placed on the documentary testimony, which is not liable to be altered by failure of memory or misunderstanding of witnesses. Down to the period, then, when the first contract was terminated by the Morgan & Garrison line, and when the Pacific Mail Steamship Company refused to pay, I am of the opinion that the contract was made for the company; that the defendant was bound to account to the company therefor, and if there are any moneys remaining unpaid to the time of the receipt of 11th of June, 1856, the plaintiff is entitled to an

account therefor. In taking such accounts, the items receipted for on the 7th July, 1856, and on the 18th of July, 1856, must be included, as they were earned prior to the time when the agreement was supposed to be abrogated by the refusal of the Pacific Mail Steamship Company to pay, on account of the opposition of Morgan & Garrison's line.

An objection is taken to this claim on the ground that the contract was immoral and could not be enforced ;. that being in restraint of trade and commerce, the court should not sustain it, but should leave the parties as the law found them, both being *in pari delicto*. That this rule would apply if the action was brought by the plaintiff or by Vanderbilt against the Pacific Mail Steamship Company, I have no doubt. The law would not enforce such a contract against the delinquent party ; or if the money had been paid, the law would not enable the party paying to recover it back, but would leave them as they placed themselves in carrying out the agreement, viz : to act upon it as a mere honorary arrangement among themselves with which the law could have nothing to do. But does such a rule apply to a principal and his agent who has received money for his principal on such an agreement ? The money has been paid to an agent for his principal by a party who could not have been compelled to make such payment. But having been paid voluntarily, it becomes the property of the principal in the agent's hands for which he should account; he has no right to refuse payment to his principal because his principal had not a legal claim for the money on the agreement. So far as there was a contract between the Transit Company and the defendant, the contract was legal. He was to receive moneys for them and pay over to the company. An agent has no right to dispute the title of his principal to moneys received by him for the principal's use. Nor has he a right to resist an action for the amount so received on the ground that the money was paid on an illegal contract between the original parties. This was so held in *Tenant* v. *Elliott*, (1 *B. & P.* 3 ;) and in *Farmer* v. *Rus-*

*sell,* (1 *id.* 296–298,) Eyre, C. J. says: " The plaintiff's demand arises simply out of the circumstance of money being put into the defendant's hands to be delivered to the plaintiff. This creates an *indebitatus* from which an assumpsit in law arises, and on that an action on the case may be maintained ;" and again : " The case is brought to this, that the money has got into the hands of a person who was not a party to the contract, who has no pretense to retain it, and to whom the law could not give it by rescinding the contract." Buller, J. also says, " When it appeared that the agent had received the money to the plaintiff's use, it was immaterial whether the money was paid on a legal or illegal contract." (*Citing Faikney* v. *Reynous, Burr.* 2069 ; *Alienbrook* v. *Hall,* 2 *Wilson,* 309.) So where a confidential relation of principal and agent exists in regard to a trust created for the benefit of the principal, the agent cannot object that the trust is void. (*Jenkins* v. *Eldridge,* 3 *Story's R.* 182.) I know of no rule which will enable an agent for such a cause to retain in his hands moneys received by him from a third person for his principal.

2d. After the making of the original contract or agreement with the Pacific Mail Steamship Company, payments were regularly made till about 11th of June, 1856 ; and some payments for trips on the other side were made afterwards. About that date the Pacific Mail Steamship Company refused to pay, on account of the running of an opposition line from New York by Morgan & Garrison. Previous to this date the act of the Rivas-Walker government in taking away the charter had gone into effect. Under it the property of the Transit Company, which was in Central America, had been taken possession of by agents appointed by that government. The defendant had made exertions both at Washington and in Central America to obtain a restoration to the company of its rights and property. These efforts had proved fruitless. The route had passed from the Transit Company into the control of Morgan & Garrison, on or before the month of April, 1856.

All the steamships of the company not seized by the Rivas-Walker government had been pledged to the defendant for advances and other moneys due him, and the possession of such ships was by resolution given to him on 12th June, 1856. The affairs of the Transit Company had become involved, their debts had accumulated, their means were all expended, and their vessels were all pledged and mortgaged for large amounts. The hope of a restoration of the charter and privileges of the company by the government of Nicaragua had vanished, and the state of the company was such as to render it almost impossible for them to run a line of steamers with the means which they possessed; and even if such a line could have been started, the vessels would have been seized on their arrival, and the passengers could not have been transported across the isthmus in opposition to the will of the existing government. The government of the United States had also recognized the Rivas-Walker government, in May preceding, and thereby had given validity in this country to the act repealing the charter of the company. It was under this state of affairs that the first agreement between the defendant and the officers of the Pacific Steamship Company was terminated by the starting of the opposition of Morgan & Garrison, and the notice from the president of the Pacific Steamship Company that they would make no further payments in consequence thereof. At that time the agent informed the president he could stop when he pleased; that he, the agent, was ready to take care of himself; and that he would run a line on his own account. In consequence of this threat on the part of the defendant, a further negotiation took place, by which the Pacific Steamship Company agreed to pay for each trip when no opposition was run, and the defendant undertook on his part to get rid of the opposition of Morgan & Garrison. This involved large expenditures on the part of the defendant in providing vessels and running opposition lines against Morgan & Garrison in the Gulf. Such expenditures were necessarily made by the defendant, because the

Murray *v.* Vanderbilt.

Transit Company had neither the means nor the credit then to carry on such an enterprise. Without any further detail of the facts proved in regard to this branch of the case, there can be but little doubt that the defendant at this time was acting on his own behalf and not for the company. That he, considering the condition of the company hopeless, would have undertaken the expenditures of large sums of money to break down the opposition of Morgan. & Garrison, without any prospect of repayment to himself, is hardly to be presumed; and my conclusion is that this second agreement for a subsidy, made about July, 1856, was made on his own account, and not for the company; and was not intended by him or the parties with whom it was made to be for any other purpose than the individual interest of the defendant.

* 3d. The subsequent agreements made in June, 1857, and in July, 1858, were of course of the same character, and intended for the individual benefit of the defendant, and not for the use of the company. The means, condition and prospects of the company having at those times become in a much worse condition than previously, and any prospect that might have been before entertained of its restoration having utterly failed, the defendant had been authorized by a resolution of the board to sell all of the steamers of the company for the purpose of paying their indebtedness. The question then arises whether the defendant bore such a relation to the Transit Company at this time as prevented him from making this agreement for his own benefit, and whether any rule of law exists, by which he can be compelled to account to the company for the moneys received by him under this agreement. The defendant had been the agent of the Transit Company previous to the 1st of June, 1856, under a resolution passed 3d January, 1856. This agency, by the resolution and by the agreement between the defendant and the company, terminated at that time, and there is no evidence to show its renewal. He had become a large creditor of the company by advances, and had liens on all the vessels of the company as

security for part of such advances and for bonds issued by the company, which he owned. The relation he bore to the company was that of president and a creditor—and the question is whether there was existing as between him and the company the relation of trustee and *cestui que trust*, which rendered it improper for him to make such an agreement for his own use. I do not deem it necessary to discuss the question whether the defendant, being president of a company having the means and the power and authority to run steamers on such a route, could make a contract to lay up such steamers and take to himself a compensation for so doing. I think it must be conceded that he could not, and that such a contract would be for the benefit of the company and not of the president. But when the company had virtually ceased to exist, when, at any rate for all purposes of business, and for promoting the object of the charter as originally granted, all its powers had been taken away, its property all expended and the company hopelessly insolvent, I have not been able to adopt the conclusion that any such rule can be applied, more especially as the agreement imposed no duty or restraint on the company. The vast number of cases to which the counsel of the plaintiff has referred are cases where the agent or trustee has taken to his own benefit the property of the *cestui que trust*, or has done some act which the *cestui que trust* through him could have done for his benefit and advantage, or has used the property of the *cestui que trust* for purposes resulting in benefit to himself which might have resulted in like benefit to the person for whom he was acting. This is not the present case. The property of the company was not used; the company could not in any way have run any line to the isthmus. The company in fact had no existence for such a purpose, and the rule in regard to a misapplication of the property or rights of the *cestui que trust* cannot apply to this case. In addition to this, the agreement imposed no duty or obligation on the company, nor was it put under any restraint thereby. The company could have run a line the

next day if it had the power and means, as fully as it could the day before the agreement was made. In order to apply this rule to the present case, we must extend it so far as to say that the defendant was prevented by his relations to the company from running any steamers to the isthmus while that relation to the company existed, and that, even after the company had lost the ability to provide vessels and run them on the account of the company. I do not understand the relation of principal and agent or of trustee and *cestui que trust* involving any such obligation. The law protects the party against the agent or trustee in the use of its property and rights, but not beyond them, and does not prevent the performance of acts which could not result in damage to the principal, or which could not conflict with the interests of the company. The being president of an insolvent corporation cannot prevent him from doing what that company had lost all ability to do, even if its existence continued. Where the company has virtually ceased to exist, and its powers have been taken away, I think the reason and policy of the rule ceases also—because no duty rested upon the agent to run the line for the company after the authority and ability of the company to do so had terminated. The case of *Abbott* v. *American Hard Rubber Co.*, (33 *Barb.* 578,) and the *Cumberland Coal Co.* v. *Sherman*, (30 *id.* 553,) were cases involving the sale of the property of the corporation; but even that rule is modified in the case of an officer, who is also a creditor, and acts for his own protection. (*Smith* v. *Lansing*, (22 *N. Y. Rep.* 526.)

It may well be doubted whether the terms of this agreement were at all within the bounds of the agency. The object of the charter of the company was to run vessels to the isthmus and back, not to make money by agreeing not to run. The duties of the president were only in furtherance of the objects of the charter. An agreement on his part not to run a line himself would have been to the benefit not the injury of the company if they had the means and power to continue

their own line.   The agreement on his part not to run was no violation of those duties, and no interference with or violation of the rights of the company.   They were not affected by it.   They had no restraint upon them by which they were prevented from running the line if they were able to do so. If it had been shown that in consequence of this agreement the defendant prevented the steamers of the company from running, another claim might have perhaps arisen out of that misfeasance.   But there is no ground for that charge.   On the contrary, as has before been remarked, the company were utterly without means to run the line, and so unable to pay the claims against them, that they had on June 2, 1856, obtained the consent of the defendant to purchase some of the vessels advertised to be sold to pay Morgan & Hoyt, and on the 12th of June had placed the possession of all their steamers with the defendant as security, and on 2d of August had mortgaged to him all their coal, coal hulks, &c. on the Pacific as security for advances, and gave him possession thereof; and in November, 1856, they authorized the defendant to sell all of the steamers of the company and apply the proceeds to the payment of their debts.   I think there can be no doubt that after the 12th of June the company was unable to carry on its business; that its powers had ceased, and that the agreement afterwards made by Vanderbilt with the Pacific Steamship Company in no way infringed the rights or interfered with the interests of the Transit Company, and in no way violated the duty he owed to that company as the president thereof.   I conclude therefore that he is not liable to account to the receiver for any moneys received by him from the Pacific Mail Steamship Company on account of the subsidy under the agreements made by him after the 12th of June, 1856.

4th. The plaintiff also claims an accounting for steamships sold by the defendant for the account of the company.   These vessels were all mortgaged to the defendant for advances made by him to the company and for bonds held by him against the

Murray *v.* Vanderbilt.

company, the validity of which is not denied. His authority to sell, therefore, cannot be disputed. All the vessels sold, excepting the Brother Jonathan, were accounted for to the company long before the appointment of the receiver. Those accounts appear to have been acquiesced in by the company. In the accounts thus rendered nothing is said of the Brother Jonathan. Lea in his testimony says that no account was ever furnished, and no evidence is given to the contrary. For the proceeds of this vessel the defendant is bound to account.

There is nothing in the evidence which would warrant the opening of the other accounts for the sale of the steamers, except that relating to the sale to William H. Vanderbilt. The other vessels appear to have been fairly sold, at a price not below their value in the condition and under the circumstances in which they were sold; and the proceeds of the sale have been accounted for to the company, and such account acquiesced in.

As to the sale of the steamers Pacific, Cortes and Uncle Sam to William H. Vanderbilt, I do not think it was such a sale as can, under the circumstances and relations of the parties, be sustained. The purchaser was his son, totally unacquainted with their value, having no occasion for the purchase. He paid no money therefor, but gave his note to the defendant, payable in a year. The defendant paid all expenses, and kept the control and management of the vessels. William does not appear to have been interested in the accounts or management of the vessels, but left all in the charge of the defendant. The defendant ran the vessels in an opposition line on the Pacific. He does not appear to have accounted or allowed for the use of them. He says he has not paid William any thing on account of them since the sale. No account has ever been rendered of these vessels by the defendant to William, nor has it ever been shown that any account between William and the defendant exists in regard to them. The negotiations for the supposed sale also, were such as to throw great doubt on the *bona fides* of the

transaction.   Under all the facts in evidence, I cannot avoid the conclusion that this purchase was rather an arrangement to get the title out of the company into the defendant. Such a transaction cannot be upheld.   If the defendant.had put up the property for sale, and had purchased the same in his own name, it might have been held to be good, because he had a lien upon it which he had a  right to protect by purchase ;_but in such a case the sale should have been an open one, with an opportunity to others to compete with him for the purchase.   Irrespective of his having a lien on the vessels by way of mortgage, he could not even have been a purchaser at such a sale, because the purchase would have been incompatible with his position as agent to sell.   This sale must be set aside, and the agent must account for the proceeds of these vessels, as sold by him afterwards.   He will be entitled to credit for all the moneys due him thereon under the mortgages, and also for all money expended for repairs prior to the sale by him.

The appraisement of the Daniel Webster, and the appropriation by the defendant of that vessel to his own use at the appraised value, can hardly be considered within the powers conferred upon him by the resolution authorizing the sale.   Had such appraisement been submitted to the company, and their assent by resolution obtained, the case would be a different one.   But the company was no party to the transaction.   They had nothing to do with the selection of the appraisers, nor were they consulted by the defendant as to the appropriation and use of the steamer by himself. The bill of sale, purporting to have been executed by the Transit Company to the defendant, for the Daniel Webster, dated the 18th November, 1856, is not entitled to consideration in connection with this branch of the case, because there was no warrant for any such bill of sale in the proceedings of the company, and no resolution appears on the minutes of the company, at any time, authorizing such a sale to the defendant.   The same remark may be made as to various other

papers executed by Lea, as secretary, for which no authority can be found in the minutes of the company, and which Lea as secretary had no authority, without such action of the board, to execute. Among them are the contract with William H. Vanderbilt, bills of sale to him of the steamers, and of coal, and bill of sale of William H. Vanderbilt's note to the defendant. All these papers appear to have been executed without any other authority from the company than that of the resolution of the 13th November, 1856, and cannot be relied on as ratifying any contract between the defendant and William as to the contracts therein stated.

The sale of the coal, hulks, &c. on the Pacific to William H. Vanderbilt, is subject to the same objections, and the same rule must be applied as that in regard to the steamers, and the same accounting therefor is ordered.

The necessity of accounting as to these vessels renders it unnecessary to examine the items for repairs on them, which were charged to the company for work done after the supposed sales. As they are to be credited to the defendant in the accounting, the charges in the accounts can remain.

The charge of $1000, for money paid to Mrs. Cazneau, does not appear to have been twice charged in the accounts of the defendant against the company. At folio 732 of Lea's testimony, there is a charge for money advanced for secret service, of $1000, and at folio 755 there is a charge for the like purposes of $16,180, as per account of that date on file. These items together amount to $17,180. On referring to that account, it will be found that the items there charged are the same, with a slight variation. The sum of $1000 in the first charge appears to have been deducted from the gross amount, and the second charge is for the balance only.

There is some evidence that the defendant, when he paid General Goicouria for secret service money, took from him one or more notes for the amount advanced.

Those notes if of any value would be the property of the

company, and not of the defendant. The defendant must deliver over the notes, or account for the proceeds if paid to him.

The defendant objects to any recovery in this case upon the ground that the republic of Nicaragua, the commissioners appointed by that government on the repeal of the charter, the Transit Company, its stockholders and creditors, or some of them are necessary parties to this action. The receiver in this matter takes the place of the company. There could be no pretense that the company, if in existence at all, could not collect a debt due to it by action, without making any of the other persons parties. If any of those named have claims against the funds and property of the company, they can enforce such claims by affirmative action, but in the collection of debts due the company there is no propriety of involving them in such a litigation. There is no validity in this objection.

The judgment rendered must be for an accounting by the defendant —

*First.* For moneys received by him from the Pacific Mail Steamship Company prior to August, 1856, excepting the money receipted for on the 8th of July, 1856.

*Second.* For the proceeds of the Brother Jonathan.

*Third.* Declaring the sale to William H. Vanderbilt to have been for the benefit of the defendant, and directing an accounting by the defendant for the moneys received by him for the proceeds of such vessels when subsequently sold by him.

*Fourth.* For the Daniel Webster, for the value of such steamer at the time she was taken by the defendant.

*Fifth.* For the proceeds of sales made by the defendant of the coal, coal-hulks, &c. on the Pacific coast, or for the value thereof, if used by him.

*Sixth.* For any notes received by the defendant from General Goicouria for the moneys advanced to him by the defendant and charged in the account for secret service money

against the company, or for the proceeds of any such notes if received by the defendant.

In taking such accounts it will not be necessary to open the other accounts rendered, or to direct any re-accounting as to all other items of account between the defendant and the company.

The defendant is to be allowed in his accounting for the steamships, all moneys expended for such steamships, and for repairing the same, up to the respective times of sale.

He is also to be allowed any moneys remaining unpaid of the advances by him on account of the company, for which he had a lien on those vessels, and any balance of money due from the company for the bonds held by the defendant, for which the steamships were pledged or mortgaged, and which was not discharged by the sale of the other steamships than those for which he is to account. Wherever any such items have been included in the accounts heretofore rendered, they are not to be charged again to that company.

For the purpose of taking such account, a reference is ordered, and all further directions are reserved until the coming in of the report.

[NEW YORK SPECIAL TERM, January 28, 1863. *Ingraham*, Justice.]