IRISH FREE STATE and Others, Plaintiffs, *v.* GUARANTY SAFE
DEPOSIT COMPANY and Others, Defendants.

Supreme Court, New York County, May 11, 1927,

**Irish Free State — loans — action in equity to have Irish Free State
declared owner of proceeds of subscriptions to loans for establishment
of Irish Republic — money was raised by " Dail Eireann " to overthrow
British government in Ireland — since Dail never functioned as duly
organized government, it never existed as de facto government —
British government was only constituted government in Ireland until
functions thereof were transferred by treaty, executed December, 1921,
to provisional Irish government — Free State is not successor of Dail
— Dail did not displace existing de jure government of Great Britain
— title paramount to funds does not vest in Free State — res adjudicata
— plaintiff not entitled to funds by reason of judgment in Irish
courts — complaint dismissed — defendant trustees not entitled to
funds — judgment directed for pro rata distribution of funds among
subscribers.**

This is an action in equity in which the plaintiff Irish Free State seeks a judgment
declaring it to be the owner of funds representing the proceeds of the balance
of subscriptions to two loans of an organization known as the " Dail Eireann,"
which was seeking to set up by force in Ireland a Republic of Ireland which
would be free of any allegiance whatsoever to the government of Great
Britain and Ireland. No such republic was established, and this action is to
determine the title to the unexpended moneys on deposit within the jurisdiction
of this court.

Since at no time from that event known as the " Easter Uprising " when inde-
pendence from Great Britain and Ireland was declared and the Republic of
Ireland proclaimed, did the " Dail Eireann " function as a duly organized
government, or make any pretense of maintaining postoffices, exercising super-
vision over railroads, issuing money or currency, establishing a school system,
or raising taxes, said Dail must be deemed never to have existed as a *de facto*
government, but rather as an organization fostering a rebellion against the
British government in Ireland. Moreover, the proof warrants a finding that
the British government never receded from the position that it was the only
constituted government within the territory comprising Ireland, until, pursuant
to a treaty between Great Britain and the Dail delegates, executed in London
December 6, 1921, the functions in connection with the administration of public
service in Southern Ireland theretofore performed by the existing British
government, were transferred to the provisional Irish government constituted
under said treaty.

The Irish Free State is neither the successor of the revolutionary group, which
raised the money, nor is it in fact the continuation of the Dail, to which the
trustees of the fund admit responsibility, for England, rather than crushing
the rebellion with military forces, set up, with the consent of the governed, a
new government to take the place of the existing government in Ireland, which
was the government of Great Britain and Ireland formed under the act of 1800,
as modified by the Government of Ireland Act of 1920. Furthermore, since

the Dail did not succeed in establishing a *de facto* government, it did not displace the existing *de jure* government of Great Britain and Ireland.

Title paramount to the funds in question, therefore, does not vest in the Irish Free State and, as it did not succeed the revolutionary organization but merely the *de jure* government of Great Britain and Ireland, it has shown no derivative title to the funds.

Nor are plaintiffs entitled to the funds in suit on the ground that the matter herein is *res judicata* by reason of the judgment in their favor in the courts of the Irish Free State, where, as matter of fact, the bondholders committee, a defendant in this action, was not a party to the action in the Irish courts.

The only government that had any claim of title whatsoever to these funds in the United States was the British government, since the Dail was in revolt against that government, but no documents submitted to this court indicate any transfer of title whatsoever of any claim by the British government to the plaintiff Irish Free State.

Even if the Irish Republic had established itself as a *de facto* government under the law of Ireland the complaint herein necessarily would have to be dismissed, since plaintiff claims by paramount title, which it does not possess and refuses to claim by derivative title.

As the plaintiff Irish Free State succeeded the *de jure* government of Great Britain and Ireland, and, under the revolutionary government known as the " Dail Eireann " said Free State has no title either paramount or derivative to the fund in question, the complaint must be dismissed.

Moreover, the defendant trustees have no title as owners of the fund, and their demand that they be left in possession thereof must be denied; no good purpose can result from leaving the funds in the possession of the trustees, since the Irish Republic was never formed and the terms of the subscription, namely, the issuance of bonds of the Irish Republic, cannot be complied with.

The demand of the committee that the funds be awarded to the Free State upon condition that the government issue bonds to the full extent of the original subscription, cannot be granted.

Since the purpose for which the funds were advanced has become impossible of fulfillment, the relief demanded of the bondholders committee should be granted to the extent that a judgment be entered decreeing that said committee and all other subscribers to the two loans in the United States are entitled to receive in proportion to their subscriptions, the proceeds of the money and securities in question, with accumulated interest, after payment of the charges and disbursements taxed or allowed by the court.

ACTION in equity for judgment declaring plaintiff to be owner of proceeds of balance of subscriptions to certain loans to an organization which was seeking to set up by force in Ireland the the Republic of Ireland.

*Stetson, Jennings & Russell* [*John W. Davis, William C. Cannon* and *Russell S. Coutant* of counsel], for the plaintiff.

*Martin Conboy* [*Martin Conboy, John F. Finerty* and *David Asch* of counsel], for the defendants De Valera and O'Mara, trustees.

*Wellman & Wollman* [*Frank P. Walsh, Henry Wollman, John T. Ryan* and *Edward S. Seidman* of counsel], for Irish Republic Bondholders Committee, John J. Hearn, chairman.

*Battle, Vandiver, Levy & Van Tine* [*George Gordon Battle, Isaac H. Levy* and *Michael Francis Doyle* of counsel], for the Noonan Committee.

*Larkin, Rathbone & Perry* [*Thomas H. Dugan* of counsel], for the Central Union Safe Deposit Company.

*Edwards, O'Laughlin & George* [*David S. George* of counsel], for Garfield Safe Deposit Company.

*Wesselman & Krause* [*William B. DeLacy* of counsel], for the Harriman National Bank.

PETERS, J.   This is an action in equity wherein the plaintiff Irish Free State seeks a judgment adjudging that it is the owner of and entitled to the possession of funds and property hereinafter described, and that the defendants Stephen M. O'Mara and Eamonn De Valera render an account of said funds and property, together with an account of all other funds and property received by them under a certain trust agreement.   The funds and property in question consist of moneys on deposit with the defendant Harriman National Bank and certain securities contained in safe deposit boxes, all within the jurisdiction of this court.   Said funds and property represent the proceeds of the balance of subscriptions to two certain loans of an organization which was seeking to set up by force in Ireland a Republic of Ireland which would be free and independent of any allegiance whatsoever to the government of Great Britain and Ireland.   Sums aggregating something over $6,000,000 were subscribed by citizens or inhabitants of this country. The greater portion of the amounts subscribed was transferred to Ireland and used for the purposes for which they were subscribed. The balance not so transferred amounts in the aggregate to approximately $2,500,000, and it is this balance which is the subject of this action.   Each subscriber to the loans subsequently received a printed form of bond certificate in the amount subscribed, which read as follows:

" Republic of Ireland.   Bond Certificate &——————— To ———:
I, Eamonn De Valera, President of the Elected Government of the Republic of Ireland, acting in the name of and by the authority of the elected representatives of the Irish Nation, issue this certificate in acknowledgment of your subscription of $——————— to the first national loan of the Republic of Ireland.   This certificate is not negotiable but is exchangeable if presented at the Treasury of the Republic of Ireland one month after the international recognition of the said Republic for one $——————— Gold Bond of the Republic of Ireland.   Said Bond to bear interest at five

per cent per annum from the first day of the seventh month after
the freeing of the territory of the Republic of Ireland from Britain's
military control, and said Bond to be redeemable at par within
one year thereafter.

## " EAMONN DE VALERA,
### " *President.*"

The uncontradicted purport of the testimony is to the effect
that these moneys were loaned for the purpose of establishing a
free and independent Republic of Ireland. It is admitted, of course,
that no such republic was established and the court must now
detemine in this action the title to these unexpended moneys.

The plaintiff Irish Free State claims possession of the funds by
title paramount, contending that it succeeded the organization
called the "Isish Republic," whether this court decides that such
organization constituted a *de facto* government or whether it was
merely an organized rebellion against the authority of the duly
constituted government of Great Britain and Ireland. The defend-
ant trustees deny that title and claim that they have a right to
continue in possession of the funds. This court by two previous
orders has permitted two bondholder committees to intervene.
One of these committees, called the " Hearn Committee," contends
that said plaintiff is not in any view of the case entitled to the
possession of the funds which were subscribed solely for the purpose
of the so-called Irish Republic, or, in the alternative, that if the
court decides that such plaintiff is entitled to the funds, then and
in that event the bondholders are entitled to the full amount of
their subscriptions, with accrued interest; that they have a lien
upon the moneys and securities now within the jurisdiction of
the court, and that a judgment should be entered in favor of the
individual bondholders for their *pro rata* share of the funds now
in control of the said trustees. The other committee, called the
" Noonan Committee," admits the right of said plaintiff to receive
the funds in question, but contends that the court should require
as a condition that plaintiff should carry out the contract and
deliver bonds of the plaintiff, of the full amount of the subscriptions,
to the subscribers. This committee says further that if this court
has no power to make such a condition because of the fact that
the said plaintiff is a sovereign power, then the moneys in question
should be delivered to said plaintiff without conditions. The
plaintiff, the Irish Free State, in reply contends that it is a sovereign
power and that, therefore, this court cannot in its judgment render
any affirmative judgment against it or prescribe any conditions bind-
ing upon it. While the testimony and the exhibits are voluminous,
the historical facts upon which the decision of the court must be predi-

cated are not numerous and are in the main undisputed. The legal conclusions to be drawn from such facts are vigorously disputed.

By the Act of Union of 1800, enacted by the King and Parliaments of Great Britain and of Ireland, Ireland formed a part of the United Kingdom of Great Britain and Ireland with one parliament called the Parliament of the United Kingdom of Great Britain and Ireland, consisting of a House of Lords and a House of Commons, and sitting at Westminster, Eng. From time to time efforts were made by some of the people of Ireland to establish a free nation, at times by parliamentary means and at other times through armed resistance to the government. The events upon which the decision of this case must be founded began on April 24, 1916, when there occurred in Dublin what is known in Irish history as the " Easter Uprising," by an armed force known as the " Irish Volunteers." Independence was declared and the Republic of Ireland proclaimed. This uprising was short-lived, being sternly suppressed by the military forces of the British government. The Irish Volunteers continued in existence, reorganized their forces and engaged in Irish political activities. In or about 1918 an Irish political party known as the " Sinn Fein Party," adopted the policy of sending forward candidates for parliamentary elections in Ireland on a pledge that if elected they would not attend the Parliament at Westminster, but would assemble in Ireland and constitute themselves a parliament for Ireland, and as such would take over the government of the country. In December, 1918, the British Parliament was duly dissolved and new elections were ordered for members in the House of Commons. At this election the constituencies in Ireland were entitled to elect 105 members to the House of Commons to sit in the British Parliament. The Sinn Fein party took advantage of the election machinery to elect candidates who had pledged themselves as aforesaid. All members elected at said election in Ireland were summoned to a meeting to be held at the official residence of the Lord Mayor, known as the " Mansion House," in Dublin on the 21st of January, 1919. This summons was issued pursuant to the aforesaid pledge made by the Sinn Fein candidates, and all of the elected Sinn Fein candidates, except those who were in the custody of the British military forces or abroad on political missions, assembled at the appointed place on January 21, 1919, and constituted themselves a parliament for Ireland, to which they gave the name of " Dail Eireann." This parliament or assembly will be hereinafter called the " First Dail." The majority of candidates elected in constituencies other than Sinn Fein candidates were elected for seats in so-called Northern Ireland, and these members

did not attend the meetings of Dail Eireann. This First Dail issued a proclamation of independence, adopted a provisional constitution and standing rules and orders and set up a ministry, and attempted to perform varied · governmental functions in Ireland. This Dail on April 1, 1919, elected the defendant De Valera Prime Minister, and on April 10, 1919, authorized a loan of £1,000,000, £500,000 to be offered for immediate subscription, £250,000 for subscription at home and £250,000 for subscription abroad. The plaintiff, Rev. Michael Fogarty, the defendant De Valera and one James O'Mara were appointed trustees for one year for the funds to be raised and subsequently executed a trust agreement in respect of such funds. A further loan of $23,750,000 was authorized by the Dail in August, 1919. The trustees were reappointed for the succeeding year. After the formation of the Dail Eireann organization the military forces of the British government became active in the work of suppressing the revolt. The activities of the First Dail will now be noted. This Dail set up ministries and a civil service for offices.

A force of unpaid volunteers was maintained, any members of which captured by the ·British in action or with arms even if not in action, were almost invariably executed after summary military trial. The force was small and active and because it was small it had to strike frequently at different points. Its real nature, however, is shown by the testimony that it was housed, fed and *concealed* by the population generally. Courts were set up which in fact first became effective after the treaty hereinafter mentioned. The British local boards were largely ousted. The Dail organization maintained no post offices, printed no stamps, exercised no supervision over railroads which were maintained by the British government, issued no money or currency, had no school system and raised no taxes. It maintained a secret police force, appointed consular agents who had no official status in the countries to which they were sent. It set up a land commission and passed decrees. The uncontradicted testimony is that throughout the period of the First Dail and the hereinafter described Second Dail and until the treaty hereinafter mentioned, though persons were appointed to ministerial positions and staffs were appointed to help them, it was impossible for them to have any permanent location for the reason that during the entire period everyone connected with the Dail was hunted down by the British and all office equipment was of a portable character capable of instantaneous removal at the approach of the British military forces. An entire department might find it necessary to make a hurried removal through a skylight or down a drainpipe at a moment's notice.

The courts tentatively set up were, like the ministry, continuously " on the run." They sat in private houses; sometimes in fields, cellars and wherever it was possible to congregate for a sufficient length of time. The Dail did not maintain jails. Occasionally persons were held by the Dail authorities, but only for short periods, and they generally had to be " on the run " with their captors. Records were always in danger of seizure. This Dail organization was never recognized by any foreign country. Another indication of the nature of the Dail organization, upon the question whether it was a *de facto* government, is apparent from a provision in the trust deed, before mentioned, which devolved the duty of disbursing the Dail funds upon the trustees or " such of them as may be *free* to act " in the event that neither a quorum of the Dail or the ministry were available or able to meet. From all the foregoing it is apparent that the Dail organization was never a *de facto* government but simply an organization fostering a rebellion or revolt against the British government in Ireland.

In an attempt to bring peace and quiet to the Irish people a statute called the " Government of Ireland Act " was enacted by the King and Parliament of Great Britain and Ireland in the year 1920, which was designed to confer upon Ireland a measure of home rule. This act provided for a separate government for six counties and two boroughs in the northeast of Ireland, defined in the act as Northern Ireland, and a separate government for the rest of Ireland, defined in the act as Southern Ireland. To make this act effective, elections were ordered for the election of members of the parliaments of Northern and Southern Ireland, respectively, by a proclamation of the King of England, to take place in May and June, 1921. The first Dail adopted a resolution to the effect that said election should be regarded as an election of members to the Dail, and that that body would automatically dissolve on the meeting of the new body. In other words, the De Valera organization again took advantage of the British election machinery in Ireland for the election of members to a new assembly which is hereinafter called the Second Dail. Candidates of the Sinn Fein party made the same pledges as in the election of 1918. Candidates elected were summoned to meet at the Mansion House, Dublin, and on August 16, 1921, 120 members elected on a Sinn Fein program assembled at the appointed place and constituted themselves the Second Dail Eireann under the constitution adopted by the First Dail. Candidates elected to the House of Commons and to the Senate for Northern Ireland made and constituted a government under the aforesaid Government of Ireland Act. The Parliament of Southern Ireland, which was provided for by said

act, was summoned to meet on June 28, 1921. The House of Commons met on that day. The First Dail ignored the two Parliaments provided for by the Government of Ireland Act.

On July 11, 1921, a truce was declared between the forces of the British government and the volunteer forces of Dail Eireann. On August 26, 1921, a new ministry was elected by the Second Dail, with the defendant De Valera as president; a further loan of $20,000,000 in the United States was authorized, and the three trustees of the loan funds were elected for the years 1921–1922. On September 14, 1921, the Second Dail appointed plenipotentiaries to treat with the British government in an effort to secure permanent peace for Ireland. These plenipotentiaries entered into negotiations at London with the British delegates headed by D. Lloyd-George, Prime Minister of England. The great obstacle to peace throughout these negotiations was the insistence by the Irish delegates on independence for Ireland and the insistence on the other hand on the part of Lloyd-George that independence would never be granted Ireland. The official correspondence relating to these negotiations is in evidence. Lloyd-George guarded most zealously against any action which would in any way involve a recognition by the British government of the independence of Ireland. In the communication to Mr. De Valera dated September 17, 1921, Mr. Lloyd-George stated: " It is idle to say that a conference in which we had already met your delegates as representatives of an independent and sovereign state would be a conference ' without prejudice.' To receive them as such would constitute a formal and official recognition of Ireland's severance from the King's dominions."

In another communication dated September 29, 1921, Mr. Lloyd-George stated to Mr. De Valera: " His Majesty's Government have given close and earnest consideration to the correspondence which has passed between us since their invitation to you to send delegates to a conference at Inverness. In spite of their sincere desire for peace and in spite of the more conciliatory tone of your last communication, they cannot enter a conference upon the basis of this correspondence. Notwithstanding your personal assurance to the contrary, which they much appreciate, it might be argued in future that the acceptance of a conference on this basis had involved them in a recognition which no British Government can accord. On this point they must guard themselves against any possible doubt. There is no purpose to be served by any further interchange of explanatory and argumentative communications upon this subject. The position taken up by his Majesty's Government is fundamental to the existence of the British Empire and they cannot alter it."

It is apparent that the British government never recognized the De Valera organization, and never receded from the position that it was the only duly constituted government within the territory comprising Ireland.

In this last letter Lloyd-George invited a meeting of the delegates with a view to ascertaining how an association of Ireland with the community of nations known as the British Empire might best be reconciled with Irish national aspirations, which invitation was accepted.

The circumstances surrounding the acceptance of the proposed treaty are best related by Mr. Barton, one of the Dail delegates, as given by him upon the floor of the Dail. The conference had precipitately and definitely broken down on December 4, 1921. Contact was re-established the next day with the English representatives and in the struggle that ensued Arthur Griffith, a Dail delegate, sought repeatedly to have the decision between war and peace on the terms of the proposed treaty referred back to the Dail. This proposal Mr. Lloyd-George negatived, stating that the delegates must either accept or reject the proposed treaty. Mr. Barton states: " Speaking for himself and his colleagues, the English prime minister with all the solemnity and the power of conviction that he alone of all men I met, can impart by word and gesture   *   *   *   declared that the signature and recommendation of every member of our delegation was necessary or war would follow immediately. He gave us until ten o'clock to make up our minds, and it was then about eight-thirty. We returned to our house to decide upon our answer. The issue before us was whether we should stand behind our proposals for external association, face war and maintain the Republic, or whether we should accept inclusion in the British Empire and take peace."

On December 6, 1921, articles of agreement were signed at London by the British and Irish delegations, which provided that Ireland should have the same constitutional status in the community of nations known as the British Empire as the Dominion of Canada, the Commonwealth of Australia and the Dominion of New Zealand, with a Parliament having power to make laws for the order and good government of Ireland, and an executive responsible to that Parliament, and should be styled and known as the Irish Free State. The position of the Irish Free State with relation to the British Parliament and government was to be similar to that of the Dominion of Canada. The representative of the Crown in Ireland was to be appointed by the King. The oath to be taken by members of the Parliament of the Irish Free State provided that the deponent would be faithful to his Majesty King George the

Fifth, his heirs and successors by law. The Irish Free State assumed liability for the service of the public debt of the United Kingdom as existing at the date of the agreement and towards the payment of war pensions as existing on that date, the sum to be determined by agreement or by arbitration. Until arrangements were made between the British and Irish Free State the former undertook the defense of Ireland by sea. The Irish Free State undertook to afford to the British government in time of peace harbor and other facilities indicated in and annexed to the agreement, and in time of war with a foreign power such harbor and other facilities as the British government might require. Until the expiration of one month from the passing of the act of Parliament for the ratification of the agreement the powers of the Parliament and the government of the Irish Free State were not to be exercisable as respects Northern Ireland, and no election was to be held for the return of members to serve in the Parliament of the Irish Free State for constituencies in Northern Ireland unless a resolution was passed by both houses of Parliament of Northern Ireland in favor of the holding of such election before the end of said month. If before the expiration of said month, an address was presented to his Majesty by both houses of the Parliament of Northern Ireland the powers of the Parliament and government of the Irish Free State were no longer to extend to Northern Ireland and the provisions of the Government of Ireland Act of 1920, so far as they related to Northern Ireland, were to continue to be of full force and effect.

On December 8, 1922, pursuant to these provisions of the treaty, an address was presented to the King by the Parliament of Northern Ireland to the effect that the powers of the government of the Free State should no longer extend to Northern Ireland. Since that time Northern Ireland has been governed by its own Parliament under the Government of Ireland Act.

It was further provided that steps should be taken for the summoning of a meeting of the members of Parliament elected for constituencies in Southern Ireland, under the provisions of the Government of Ireland Act; for the setting up of a provisional government and that the British government should take steps necessary to transfer to such provisional government the powers and machinery requisite for the discharge of its duties.

It was further provided that the treaty should be submitted by the British government for the *approval* of the British Parliament and by the Irish signatories *to a meeting summoned for the purpose of the members elected to sit in the House of Commons of Southern Ireland.* If approved, the treaty was to be ratified by the necessary legislation.

On January 7, 1922, the Dail Eireann approved the treaty. *This approval was a voluntary action as such action was not requisite under the treaty.* Following the approval of the treaty by the Dail Eireann delegates, defendant De Valera and his ministry resigned and a new ministry of the Dail was elected on January 10, 1922. Shortly thereafter, at a joint meeting of the trustees and the ministers of the Dail, it was agreed that the funds of the Dail should be kept in the names of the three trustees. Pursuant to the provisions of the treaty a meeting of the members elected to sit in the *Parliament of Southern Ireland* was held on January 14, 1922, the treaty was approved and a provisional government set up. The Second Dail met for the last time on June 8, 1922.

An election of members to a Parliament to which the provisional government should be responsible, as provided for in the treaty, was duly called and was held in June, 1922. This body, thus elected, constituted the provisional Parliament. This Parliament convened on September 9, 1922, and on the thirteenth of the month attempted to appoint the Rev. Michael Fogarty, Richard Mulcahy and Richard Hayes trustees for the funds of the former Dails, intending to oust the defendants De Valera and O'Mara as trustees. The power of the provisional government to oust these two defendants is questioned in this action.

The British Parliament on March 31, 1922, passed the Irish Free State Agreement Act, thus ratifying and enacting into law said agreement. The act provided that the articles of agreement should have the force of law as from the date of the passing of the act. The act further provided that within four months the Parliament of Southern Ireland should be dissolved and that steps should be taken for the holding of an election to the provisional Parliament from the constituencies which would have been entitled to elect members to the Parliament of Southern Ireland, and the members so elected were to constitute the House of Parliament to which the provisional government should be responsible. The British government, on April 1, 1922, pursuant to the treaty agreement, by an order in council, provided for the transfer of functions in connection with the administration of public services in Southern Ireland theretofore performed by the existing *British* government departments and offices to the provisional government constituted under the treaty. The Constitution of the Irish Free State was adopted by that government on October 25, 1922, and on December fifth of the same year the British Parliament enacted the Irish Free State Constitution Act, thus creating plaintiff, the Irish Free State, which is now a government consisting of the King, an Irish

Parliament called the " Oireachtas," consisting of an upper house, the Seanad Eireann, and a lower house, the Dail Eireann, and a ministry called the executive council. On December 6, 1922, the Constitution of the Irish Free State was declared to be in operation by a proclamation by the King made pursuant to the Irish Free State Constitution Act.

It is manifest from the foregoing that the object or the purpose for which the moneys were subscribed by the so-called bondholders, that is, the establishment of a Republic of Ireland free and independent of any allegiance to Great Britain, was never accomplished, and it follows, therefore, that if it were not for the claim of the plaintiffs the said subscribers would be entitled to a return in proportion to the amounts of their subscriptions of the funds and property within the jurisdiction of this court. Manifestly, the trustees would not have any legal title to the funds, holding such funds merely as such.

It is, therefore, necessary to consider the propositions advanced by the plaintiffs' counsel to support their claim of title.

Plaintiffs' first contention is that the Irish Free State is the successor of the original *de facto* government which raised the money. As hereinbefore shown, and held in this opinion, the so-called Irish Republic never existed as a *de facto* government.

Plaintiffs next contend that (a) if the *de facto* status has not been established then the Irish Free State is the successor of the revolutionary group which raised the money; (b) the Irish Free State is also in fact the continuation of the very Dail Eireann which raised the money and to which the trustees admitted they were responsible.

With these contentions this court cannot agree. The De Valera group, organized as the Dail Eireann, were engaged in a revolt against the only lawful government existing in Ireland, which was the government of Great Britain and Ireland formed under the act of 1800, as modified by the Government of Ireland Act of 1920. This was the *de jure* government existing in the territory of Ireland up to the time of the formation of the Irish Free State.

England did not crush this rebellion or revolution with military force, but set up, with the consent of the governed, a *new* government to take the place of the *existing* government in Ireland. This consent, so far as Southern Ireland was concerned, consisted of the approval of the treaty *by the duly constituted Parliament for Southern Ireland* as provided for by that instrument. The treaty absolutely ignored the Second Dail and, as before stated, the approval by that body was wholly voluntary and without any legal effect. This government of the Irish Free State was, there-

fore, set up by the English government with the consent of the people of Southern Ireland.

As the government of Great Britain and Ireland was the only existing government in Ireland, with a revolt on its hands in the form of the Dail Eireann organization, how can it be said tht the new government set up by England succeeded the revolt and not the legal existing government? Such a conclusion would be an assertion that the new government succeeded an unsuccessful rebellious organization and not the existing government of Ireland.

In the case of *The King of the Two Sicilies* v. *Willcox* (1 Sim. [N. S.] 301) the court said: " Every government, in its dealings with others, necessarily partakes, in many respects, of the character of a corporation. It must, of necessity, be treated as a body having perpetual succession." In short, when a revolt succeeds so far as to become a *de facto* government which displaces a *de jure* government, this change merely affects the character of the government, but does not interrupt its perpetual succession. If, therefore, the Dail Eireann had succeeded in displacing the *de jure* government of Great Britain and Ireland and had become a *de facto* government, while the nature of the government of Ireland would have changed, such change would not have interrupted the perpetual succession of the government. The *de facto* government would merely have succeeded the *de jure* government previously existing, and the Irish Free State would have succeeded the *de facto* government, thus preserving the continuity of the government of Ireland. As the Dail Eireann did not succeed in establishing a *de facto* government, it, therefore, did not displace the existing *de jure* government. It follows, therefore, that the Irish Free State succeeded the only government in existence in Ireland at the time it came into being, to wit, the *de jure* government of Great Britain and Ireland.

The plaintiff Irish Free State has not shown that it has a title paramount to the funds in question, and as it did not succeed the revolutionary organization, but merely the *de jure* government in Ireland, it has shown no derivative title to the funds in question. The complaint must, therefore, be dismissed unless this court is bound by the judgment in the so-called Irish action, hereinafter referred to.

Plaintiffs also contend that apart from any succession or continuation of the present government to the Dail Eireann the present government has succeeded in title to all property acquired for purposes of the revolution which was carried on in Southern Ireland. In short, the Irish Free State claims title irrespective of succession to or continuation of the Dail Eireann. This is, in fact, a claim of paramount title to the funds in America. This claim

will be hereinafter discussed when we come to consider the opinions of the English courts.

Plaintiffs finally assert that the questions of successorship of the Irish Free State to the Dail Eireann and to the title to the funds in suit are matters of Irish law; that under the law as determined in the so-called Irish action plaintiffs are entitled to the property, and that the matter is *res adjudicata* as between the plaintiffs and the defendant trustees.

As a matter of fact the defendant bondholders in this action were not parties to the action in the Irish Free State courts, and the judgment of that court is not *res adjudicata* in this action, as to such bondholders, at least. This court is, therefore, at liberty to determine the questions involved in this action. While the judgment in the Irish action may not be *res adjudicata*, nevertheless on questions such as are involved in this action the opinions and judgment of the Irish court are entitled to the highest respect and should be followed, unless this court finds itself unable to agree with the results arrived at in the opinions of the court.

The action in question, instituted in the High Court of Justice of Saorstat Eireann, or the Irish Free State, was an action between the three trustees, which the Irish Free State attempted to appoint, of the funds in question and the fiscal officers of that sovereignty, and the defendant trustees in this action, to wit, Eamonn De Valera and Stephen M. O'Mara. The action was brought to recover the sum of $10,000 of the funds of the Dail Eireann which were within the jurisdiction of the court; also for an accounting of all other moneys or property received by the defendants from any source. The justice in the court in which the action was brought states that it had not been shown to him that the action before him referred to or dealt with the same funds which were to be dealt with by the New York Supreme Court. Judgment was given in favor of the plaintiffs.

An appeal was taken to the Supreme Court of the Irish Free State and an opinion written by each of the three judges constituting that court. The prevailing opinions were written by Mr. Justice Johnston and Mr. Justice Fitzgibbon. A perusal of these opinions discloses that (1) this highest appellate court of the plaintiff Irish Free State expressly refused to pass upon the question whether or not the two Dail Eireanns ever established themselves as a *de facto* government, the court holding that it was unnecessary to speculate upon the success of these Dails; (2) the court refused even to determine the validity of the attempted ouster of the trustees, De Valera and O'Mara, by the Irish Free State government; (3) the court refused to pass upon the question as to whether or not

the Irish Free State was the successor of the Dail Eireann, and (4), as pointed out by Mr. Justice JOHNSTON, the court was not passing upon the rights of foreigners who had entered into contractual relations of a mutual character with the First or Second Dail. The learned justice wrote: " It must not be forgotten that this is not the case of the Free State Government seeking to recover something from a person, whether a citizen of this country or a foreigner, who had entered into contractual relations of a mutual character with the First or Second Dail. No rights of third parties are in any way involved or called in question in these proceedings."

The following quotation from the opinion of Mr. Justice FITZGIBBON is the basis of the decision of the Irish High Court: " In my opinion, upon the signing of the articles of agreement for a treaty with the delegates of the revolutionary Dail the ratification of the action of its delegates by that assembly and the consequent establishment of the provisional government and the *de jure* and *de facto* government of the Irish Free State that government became absolutely entitled to all the property and assets of the revolutionary government upon which as a foundation it had been established."

This court has hereinbefore disagreed with this conclusion upon the ground that the Irish Free State did not succeed the revolutionary Dail, but succeeded the *de jure* government of Great Britain and Ireland, which was the existing government of Ireland.

After discussing several English cases the court makes the following conclusion, with which this court agrees: " These cases established the proposition that if the British government had been completely successful in crushing the insurrectionary movement in Ireland it could have claimed and recovered the funds now in question as the successor of the revolutionary government which had collected them."

In the opinion of this court the only government that had any claim of title whatsoever to these funds in the United States was the British government, because the Dail was in revolt against that government, and in none of the documents submitted to this court has there been shown any transfer of title whatsoever of any such claim by the British government to the plaintiff Irish Free State.

The conclusion of the court follows immediately after the language just quoted: " How much more, then, is the government which succeeded to that of the Second Dail by the express vote of the latter in approving of the treaty with Great Britain and by the suffrages of the electorate of the Saorstat Eireann entitled as the lawful successor of the Second Dail."

For the reasons stated this court disagrees with this conclusion. The cases upon which the court based its opinion upon questions

of international law and upon which the plaintiffs in large part rely are: *United States of America* v. *McRae'* (L. R. 8 Eq. 69); *The King of the Two Sicilies* v. *Willcox* (1 Sim. [N. S.] 301); *United States* v. *Prioleau* (2 H. & M. 559); *Republic of Peru* v. *Dreyfus Bros. & Co.* (L. R. 38 Ch. Div. 348); *State of Yucatan* v. *Argumedo* (92 Misc. 547).

In the *McRae Case* (*supra*) this government instituted an action in the English courts for the purpose of obtaining an account of moneys and goods which came to the hands of the defendant as agent or otherwise on behalf of the pretended Confederate government during the Civil War. The learned court pointed out that in such a case the successful or successor government could base its title to property of the defeated or former government upon one of two rights. As to funds which had been taken from the treasury of the existing government by the rebels, and which moneys, goods or treasures or the proceeds thereof were capable of being identified or earmarked, and could be traced into the possession of any person, the rightful owner, that is, the restored or successor government, would be entitled to apply to a proper tribunal having jurisdiction to award restitution. In other words, title of this nature is the paramount title of the original owner. The funds and securities in this action were never taken from the treasury of the British government, which was the government in existence at the time they were collected, or from the treasury of the Irish Free State, for such government was not in existence, so that plaintiff cannot successfully claim a paramount title to them.

As to the nature of the second right of title the court said (L. R. 8 Eq. 75): " But there is a right incident to the power of sovereignty which is applicable to the case. I apprehend it to be the clear public universal law that any government which *de facto* succeeds to any other government, whether by revolution or restoration, conquest or reconquest, succeeds to all the public property, to everything in the nature of public property, and to all rights in respect of the public property of the displaced power, whatever may be the nature or origin of the title of such displaced power. * * * But this right is the right of succession, is the right of representation, is a right not paramount, but derived, I will not say under, but through, the suppressed and displaced authority, and can only be enforced in the same way, and to the same extent, and subject to the same correlative obligations and rights as if that authority had not been suppressed and displaced and was itself seeking to enforce it."

The court pointed out that the plaintiff, as to the property in question, did not show any evidence of a paramount title, that is,

the property had not originally belonged to the United States, and held that the only right plaintiff could show was a derivative right. As the government of the United States had failed to show any title based upon paramount right, and as it refused to submit to the jurisdiction of the English court and abide the result of an accounting between the government and the defendant agent in question, the English court *dismissed* the bill of complaint.

One of the witnesses in the case at bar, Mr. Kennedy, Attorney-General of the plaintiff Irish Free State, testified that the *McRae* case is the law of Ireland. It follows, therefore, even if the Irish Republic had established itself as a *de facto* government, that under the law of Ireland, as well as upon the authority of this decision, the complaint herein would have to be *dismissed*, because plaintiff claims by paramount title, which it does not possess, and refuses to claim by derivative title, that is, refuses to adopt the contracts between the subscribers and the so-called Irish Republic relating to the loans, and issue bonds therefor.

In the *McRae* case the court pointed out that as the claim of the United States was based upon a claim of paramount title, there was no ground for the interposition of the court as a court of equity. In the case at bar plaintiff comes into this court of equity and denies the power or jurisdiction of the court to adjudge that equity be done the bondholders who are the other contractual parties. It is interesting to note that English counsel for the defendant, in his argument in the *McRae* case, stated that the bill of complaint was distinctly framed so as not to cast upon the United States government the odium of claiming the contributions to the insurrectionary loan placed in England. It is significant that the government of Great Britain and Ireland, which alone might have the right to claim the funds in question, has failed to bring suit or in any manner to claim the funds in question.

The next case relied upon is *The King of the Two Sicilies* v. *Willcox (supra)*. In that case the complaint alleged that during an insurrection in Sicily moneys had been taken from the treasury of the government and sent to England to purchase two ships, one of which had been fully paid for and delivered, and the other partly paid for and in the possession of one of the defendants. Upon this complaint the plaintiff government was entitled to claim by title paramount. The answer set up that the moneys to purchase the ships had been raised by voluntary subscription of thousands of persons in Sicily. This would make the title of the government to the ships in question a derivative right. The action prayed for an injunction restraining the defendants from parting, without plaintiff's consent, with possession of the ship which had

not been paid for in full. In the bill of complaint the plaintiff *adopted* the contract of purchase of the ship in question. The injunction was presumably asked for until plaintiff could pay for the ship in full.

The opinion was rendered upon a motion for an inspection of documents in the possession of the defendants. The motion was opposed by defendants' agents on the ground that they were trustees for the persons who had subscribed the money, and, therefore, that they should not be required to disclose the documents, as they were only agents or trustees. The court did not sanction this contention, holding that the defendants were not trustees of the subscribers, but of the officers of the insurrectionary movement, and that as the *de facto* government no longer existed they were no longer trustees of those agents. The court held, further, that the King, upon coming into legal possession of the kingdom again, succeeded to the *de facto* government, and, therefore, the trustees could not refuse to disclose the documents. In the case at bar, as pointed out, the Irish Republic was never a *de facto* government, and the case is thus distinguishable. It is significant that the plaintiff government in the case just discussed, upon coming into court, *adopted* the contract in question.

In *United States* v. *Prioleau (supra)* it appeared that the Confederate States had raised funds by voluntary contributions and taxes and thereby became the possessor of certain cotton. This cotton was shipped to London, part of the proceeds to be used in the payment of the purchase price of certain vessels. The court said (2 H. & M. 563): "Then upon the second point, as to the claim of the defendants under the agreement: I confess that I do not see much room to doubt that the United States must take subject to the agreement."

The court held that the proceeds of the cotton in question passed to the re-established United States government subject to such contracts as the *de facto* Confederate government might have entered into.

In the case of *Republic of Peru* v. *Dreyfus Bros. & Co. (supra)* the court held that a government displaced by a revolutionary *de facto* government and subsequently restored, is bound by international law to treat any contract made by the *de facto* government as valid, and in a litigation with a foreigner, party to the contract, must adopt the contract, merely taking such rights as the *de facto* government might have had under it. In the course of the opinion the court said (L. R. 38 Ch. Div. 361): "The plaintiffs are seeking to prevent the defendants from receiving the proceeds of eleven cargoes of guano which were consigned to them on certain terms by Senor

Pierola's government, disregarding the terms on which such consignment was made.  In *United States of America* v. *Prioleau,* a similar claim was made to goods which rebellious States of America had sent to a citizen of this country.  The rebellious States had been conquered by the United States government; they had never been recognized by England's government.  Yet it was held, and the decision has not been questioned, that the contract under which the goods were sent must be recognized, and that they could not be recovered in violation of that contract.  It was not doubted that the United States were entitled to all public property belonging to the rebellious States; but where these States had dealt for value with citizens of another country such property could not be recovered by treating the contract as void."

It has several times been suggested in plaintiff's brief that to take any action other than awarding the funds in question to the plaintiff Irish Free State, free and clear of any obligations or conditions, would be an improper action on the part of this court. To that suggestion the following language of the English court in the case just quoted is applicable: " In a litigation with the foreigner, party to the contract, they must adopt the contract and merely take such rights as the *de facto* government of the rebel states might have had under it."

In *State of Yucatan* v. *Argumedo (supra)* the plaintiff sought to recover moneys which had been abstracted from its treasury during a period of anarchy in the country, so that this was a case where plaintiff was able to show title paramount.  It is thus seen that none of the foregoing cases relied upon by plaintiffs support their position, but on the contrary, each one is an authority against that position.

An authority upon the proposition that the complaint herein must be dismissed upon the decision in the *McRae* case is the opinion of the Supreme Court of the Irish Free State, in the so-called Irish action.  In that action, which plaintiff claims is binding upon this court, the court said: " The government of the Irish Free State has done what the United States refused to do in the *McRae* case.  It has asked for an account to be taken between itself and the agent of the government through which it claims.  Not only that, but it has made, as requested by the defendant Mr. De Valera, provisions for the payment off of the Irish Republic Government loan.  * * * "

In other words, in the Irish action, the plaintiff Irish Free State did not claim by paramount title, but by derivative title, and represented to the court that provisions had been made for the payment of the loan.  Three years have elapsed and no provision

whatsoever has been made by the Irish Free State for the payment of the loan in question or for the issuance of bonds to secure the subscribers.

Another consideration to be borne in mind is that the Irish Free State is the government of only the southern part of Ireland. If this government were entitled to claim these funds, the existing independent government of Northern Ireland would have an equally valid claim.

As the plaintiff Irish Free State succeeded the *de jure* government of Great Britain and Ireland, and not the revolutionary organization known as Dail Eireann, said plaintiff has no title either paramount or derivative to the funds in question, and the complaint must, therefore, be dismissed. Even if this conclusion be incorrect the complaint must be dismissed upon the authority of the *McRae* case, for said plaintiff claims by paramount title and not by derivative title offering to adopt the contracts.

The defendant trustees have no title as owners of the funds in question, and their demand that they be left in possession of the same must, therefore, be denied. No good purpose could result from leaving them in possession of the trustees, for the reason that the Irish Republic was never formed and the terms of the subscription, *i. e.*, the issuance of bonds of the Irish Republic, cannot be complied with.

With the complaint dismissed on the ground that the plaintiff Irish Free State has not title to the funds in question, and as the government of Great Britain and Ireland has made no claim to the funds, the only parties entitled to the possession of the money are the original subscribers, and the two bondholder committees in their answers have set up counterclaims demanding judgment for the funds. The demand of the Noonan Committee that the funds be awarded to the Irish Free State upon condition that that government issue bonds to the full extent of the original subscriptions cannot, in view of the foregoing opinion, be granted.

As the purpose or object for which the funds in question were advanced has become impossible of fulfillment (*Thomas* v. *Hartshorne*, 45 N. J. Eq. 215), the relief demanded by the Hearn Committee should be granted to the extent that a judgment be entered decreeing that these defendants and all other subscribers to the two loans in the United States are entitled to receive, in proportion to their subscriptions, the proceeds of the money and securities in question, together with accumulated interest, after payment of all proper charges and disbursements taxed or allowed by the court.