(92 Misc. Rep. 547)

### STATE OF YUCATAN v. ARGUMEDO et al.

(Supreme Court, Special Term, New York County. December, 1915.)

1. INJUNCTION ⬅️136—INJUNCTION PENDENTE LITE—MISAPPROPRIATION OF MONEY—IRREPARABLE INJURY.

Where, in an action by a foreign state against a former acting governor thereof and his depositaries, to recover money unlawfully removed by him from the treasury of the state and placed in safe deposit boxes, defendant admits his obligation and expresses a willingness to account to the

proper authorities, but disputes plaintiff's right to be regarded as such, and it appears that continuance of the misuse of the money during pendency of the action must inevitably cause irreparable injury, in view of a showing that defendant cannot be made to respond to a money judgment for the amount involved, the case is a proper one for the issuance of an injunction pendente lite.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 305, 306; Dec. Dig. ☞136.]

2. CONSTITUTIONAL LAW ☞68—JURISDICTION OF COURTS—POLITICAL QUESTIONS—ACTION BY FOREIGN STATE.

While a New York court will decline to entertain jurisdiction of an action brought by a state of a foreign country, against a former acting governor thereof for misappropriated money, where the controversy necessitates the determination as to which of the two factions of the state constitutes the de facto government, a contention that such controversy exists will not deprive the court of jurisdiction, where the question has been settled by recognition officially extended by the President of the United States to the central authority from which the government of the plaintiff state derives its authority.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 125–127; Dec. Dig. ☞68.]

3. INTERNATIONAL LAW ☞4—ACTION BY FOREIGN STATE—DEFENSE—VALIDITY OF STATE'S GOVERNMENT.

In an action by the state of Yucatan against a former acting governor thereof for money wrongfully taken from the state treasury, a contention that the government of Yucatan is not a government in compliance with the constitution and laws of that state, and therefore not a stable government, will not avail defendant, in view of the official recognition extended by the President of the United States to the Carranza government, from which the government of the plaintiff state derives its authority; the opinion of the President on the question of whether a stable government has been established being conclusive on the court, regardless of whether it be right or wrong.

[Ed. Note.—For other cases, see International Law, Cent. Dig. § 4; Dec. Dig. ☞4.]

4. EVIDENCE ☞23—JUDICIAL NOTICE—PORTS OF ENTRY.

Where in such case it appears that, in addition to the recognition extended, the President placed an embargo on the shipment of arms and munitions of war to Mexico, but excepted from the embargo all ports of entry in Mexico, with certain exceptions, thereby recognizing the territory excepted as being under the control of General Carranza, the court will take judicial notice that the port of Progreso, Yucatan, thus specifically excepted from the embargo, is a port of entry.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 29, 30; Dec. Dig. ☞23.]

5. INTERNATIONAL LAW ☞4—RECOGNITION OF DE FACTO GOVERNMENT—EFFECT—RIGHT TO SUE.

Where a de facto government is recognized and becomes the de jure government, the recognition relates back to the inception of the government, and it therefore becomes lawful from the beginning; and hence it did not affect the right of such plaintiff to sue that the action was brought a few days before recognition was extended to the Carranza government.

[Ed. Note.—For other cases, see International Law, Cent. Dig. § 4; Dec. Dig. ☞4.]

6. ACTION ☞13—ACTION BY FOREIGN STATE—PARTIES—AMBASSADORS.

An action by the state of Yucatan against a former acting governor thereof for money wrongfully taken from the state treasury need not be

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

brought by the ambassador of the republic of Mexico on behalf of the state, but may be brought by the state in its own behalf.

[Ed. Note.—For other cases, see Action, Cent. Dig. §§ 76–83; Dec. Dig. ☞13.]

7. ACTION ☞28—WAIVER OF TORT.

Where defendant, a former acting governor of the state of Yucatan, wrongfully took money from the state treasury, it was competent for the state to waive the tort and sue on the obligation to account, which arose from defendant's breach of his fiduciary obligations.

[Ed. Note.—For other cases, see Action, Cent. Dig. §§ 196–215; Dec. Dig. ☞28.]

8. COURTS ☞9 — JURISDICTION — CONTRACTS — TRANSITORY TORTS — FOREIGN STATES.

A court of general jurisdiction has jurisdiction of causes of action arising in a foreign state or country between nonresidents, aliens, or foreigners, both in actions of a contractual nature and in cases of transitory torts.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 18; Dec. Dig. ☞9.]

9. COURTS ☞9—JURISDICTION—ACTION BY FOREIGN STATE.

Where, in an action by the state of Yucatan against a former acting governor thereof for money taken from the state treasury, it appeared that the action of the United States government in recognizing the Carranza government had established that defendant was a mere usurper, defendant's contention that the questions arising on an accounting involved the lawfulness of defendant's expenditures which could properly be determined only by the courts of Yucatan, could not operate to deprive the New York court of jurisdiction, especially where it was conceded that defendant did not intend to return to Yucatan, and it appeared that to decline jurisdiction would leave the state of Yucatan without remedy.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 18; Dec. Dig. ☞9.]

10. INJUNCTION ☞148—INJUNCTION PENDENTE LITE—INDEMNITY BOND.

Where, in an action by the state of Yucatan against a former acting governor thereof for money wrongfully taken from the state treasury, a portion of which has been deposited by him in a safety deposit box in his own name at the Havana branch of the defendant bank, an injunction pendente lite is granted, such bank is entitled to be protected by a bond of indemnity, with proper security, holding it harmless against possible loss because of any proceedings that may be brought in Cuba.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 323–334; Dec. Dig. ☞148.]

Action by the State of Yucatan against Abel Ortiz Argumedo and others. Motion to continue pendente lite a temporary injunction. Motion granted.

Curtis, Mallett-Prevost & Colt, of New York City, for plaintiff.
William J. Lamey, of New York City, for defendant Argumedo.
Zabriskie, Murray, Sage & Kerr, of New York City, for defendant Royal Bank of Canada.

SHEARN, J.   This is an action for an accounting and for a permanent injunction, prosecuted by the state of Yucatan, one of the states constituting the republic of Mexico, against the defendant Argumedo, who for a period of five weeks and while the state of Yuca-

tan was in a condition of revolution and anarchy acted as governor of the state, and against his depositaries.

[1] The complaint alleges that approximately 900,000 pesos of gold Mexican currency were unlawfully removed from the treasury of the plaintiff state by the defendant Argumedo while he was acting as governor, and while he was, therefore, in the position of a trustee for the plaintiff, and under a duty to account for the safe custody of these funds. It is also alleged that Argumedo is now residing within the jurisdiction of this court, and that a portion of the moneys is within the jurisdiction, and is being unlawfully appropriated by him to his own use. The essential allegations in the complaint are sufficiently established for the purpose of this proceeding. Indeed, the defendant admits his duty and expresses his willingness to account "to the proper authorities," but disputes the plaintiff's right to be regarded as such, assails the right of the plaintiff to maintain the action, and urges that the court is without jurisdiction to adjudicate the issues, and further that, if it has jurisdiction, such jurisdiction should be declined.

It is unnecessary to cite authorities to show that the complaint states a cause of action in equity for an accounting and an injunction, or to show that the case is a proper one for an injunction pendente lite. It is obvious that the commission or continuance of the alleged facts of misappropriation and misuse of the moneys belonging to the plaintiff during the pendency of the action must inevitably cause irreparable injury to the plaintiff, in violation of its rights, and, further, in view of the showing that the defendant Argumedo is not of sufficient responsibility to respond to a money judgment for anything like the amount involved, that the acts in question tend to render any judgment herein ineffectual. The principal questions, therefore, relate to the question of jurisdiction and the right and capacity of the plaintiff to maintain the action.

This action was instituted by authority of Governor Salvador Alvarado, the present Constitutionalist governor of Yucatan. The revolutionary movement of the Constitutionalists had as its avowed purpose the overthrow of General Victoriano Huerta, who was alleged to have usurped the executive power of Mexico, and the restoration of constitutional government. General Carranza was named as their leader by the so-called Plan of Guadalupe on March 26, 1913. The constitutional government under Carranza was established in 1914, when one Cortes, appointed governor of Yucatan by Huerta, recognized the triumph of the Constitutionalist by voluntarily offering to turn the state over to them, and did so to Major Avila, who was appointed governor by General Carranza, but was superseded on January 27, 1915, owing to suspected disloyalty, when General De los Santos was appointed governor by General Carranza. The defendant Argumedo was appointed commander of the garrison at Temax, Yucatan, by De los Santos. On February 11, 1915, the defendant and his friends drove out De los Santos, at first claiming to be an adherent of Carranza, but later, and as soon as Argumedo obtained control, he proclaimed his independence of the Carranza constitutional government in Mexico

under the claim of state sovereignty for Yucatan. De los Santos with his troops joined General Salvador Alvarado, commanding the Constitutionalist army of the southeast in the neighboring state of Campeche, who was thereupon appointed governor of Yucatan by General Carranza, and advanced to suppress the faction headed by the defendant Argumedo.

On March 2, 1915, while Merida, the capital of Yucatan, was under the military control of the defendant Argumedo, he signed as governor, and one Manuel Yrigoyen Lara, whom he had appointed, signed as secretary general of the state, an order levying a forced loan of 1,100,000 pesos on the Banco Peninsular Mexicano in Merida, and this money was delivered to the treasurer general of the state and the cashier who presented the order. The money was put into the state treasury, and the defendant claimed that it was to be used for the sole purpose of purchasing arms and ammunition for the protection and defense of Yucatan and its property. It is alleged that no part of it was so used, but this is denied by the defendant. On March 17, 1915, defendant Argumedo, learning of the near approach of the Constitutionalist army under General Alvarado, left Merida, taking with him a large part of the money obtained by the forced loan from the bank, and in the latter part of the month fled from Yucatan with these moneys and went to Havana, Cuba, where he deposited a portion of the money in a safe deposit box rented in his own name at the Havana branch of the defendant Royal Bank of Canada. In April, 1915, he came to New York City, and it is alleged deposited a portion of the money in a safe deposit box rented in his own name at the office of the defendant Woolworth Building Safe Deposit Company. In the meantime, and on March 19, 1915, Governor Alvarado took possession of the capital at Yucatan, restored a semblance at least of order, and guaranteed protection to all, including former refugees of the Argumedo faction. Since then he has continued in control of the government and territory, levying the regular taxes, administering the law through the courts, and carrying on the various functions of the state government. Up to date he has had no opposition of any kind, either civil or military.

Since March, 1915, the representative of the United States department of state has been instructed to take up various matters affecting the interests of American citizens in Yucatan with the officials of General Carranza as the authorities actually in control of the territory; it being understood by the state department that officials of the state of Yucatan acknowledge the superior authority of General Carranza. Governor Alvarado acknowledges and obeys General Carranza as the head of the federal government of Mexico. This action was begun on October 1, 1915. A few days later, namely, on October 19, 1915, the government of the United States extended recognition "to the de facto government of Mexico, of which General Venustiano Carranza is the chief executive," and the Secretary of State notified the representative of General Carranza that:

"The government of the United States will be pleased to receive formally in Washington a diplomatic representative of the de facto government as soon as

it shall please General Carranza to designate and appoint such representative, and, reciprocally, the government of the United States will accredit to the de facto government a diplomatic representative as soon as the President has had opportunity to designate such representative."

[2-5] If this were a controversy between two factions, each claiming to constitute the de facto government of a foreign state and in order to render an effective judgment the court had to determine which faction did constitute the de facto government, this court would naturally decline jurisdiction. Such a question is political in its nature, not judicial. Jones v. United States, 137 U. S. 202, 212, 11 Sup. Ct. 80, 34 L. Ed. 691. But this political question has been settled, for the time being at least, and at any rate for the purposes of this litigation, by the President of the United States, who has officially recognized General Carranza as the central authority of Mexico. This recognition, as Governor Alvarado holds under and acknowledges the authority of General Carranza, and as the Department of State has been instructed to take up matters affecting the interests of American citizens in Yucatan with the officials of General Carranza, clearly involves the recognition by the United States of the authority of General Carranza's governor in Yucatan. Furthermore, coincident with the recognition of General Carranza, the President issued a proclamation placing an embargo on the shipment of arms and munitions of war to Mexico; but by a separate order to the Secretary of the Treasury he excepted from the embargo "all ports of entry in Mexico, except those along the international boundary in the states of Chihuahua and Sonora and all the ports in Lower California," basing this action upon the report of the Department of State that in all such ports of entry "the recognized de facto government of Mexico is now in effective control." Among the ports of entry thus excepted from the embargo is the the port of Progreso, Yucatan, a fact of which the court will take judicial notice. The fact is thus established that the recognition of General Carranza's central government also involves the recognition that his government "is now in effective control" of the state of Yucatan.

Defendant suggests in his affidavit that the plaintiff government "is not a government by the people, and is not a government under their consent." But "recognition is generally given by a written or oral declaration of the recognizing state; it matters little whether the recognized state co-operates in it or not." Moore's Digest of International Law, 73. It is therefore immaterial to inquire whether or not the present recognized government is in accordance with the previous constitution or laws of Yucatan. It is enough that it is now the recognized sovereign; the action by the chief executive of the United States government conclusively binding this court and all courts in this country. This deprives of any weight whatsoever defendant's contention that his accounting, which he admits he is obligated to make "to the proper authorities," should be postponed until "a stable form of government is established." In view of the action of our government, it is merely incumbent upon this court to find that the authorities who directed the bringing of this suit are "the proper authorities" and that they in fact

constitute "a stable form of government." Recognition is never accorded until, in the opinion of the executive, the government recognized is stable, and on this political question the opinion of the executive, whether right or wrong, is the only opinion that can be considered. United States v. Palmer, 3 Wheat. 610, 4 L. Ed. 471; Williams v. Suffolk Ins. Co., 13 Pet. 415, 420, 10 L. Ed. 226; Jones v. United States, supra; Pearcy v. Stranahan, 205 U. S. 257, 265, 27 Sup. Ct. 545, 51 L. Ed. 793; Kennett v. Chambers, 14 How. 38, 49, 14 L. Ed. 316; Luther v. Borden, 7 How. 1, 44, 12 L. Ed. 581; O'Neill v. Central Leather Co., 87 N. J. Law, 552, 94 Atl. 789.

It makes no difference that the recognition followed by a few days the institution of this action, for the recognition of the Carranza government relates back to its inception, and all acts of the plaintiff government of Yucatan, such as the bringing of this action, are ratified. The plaintiff, as the recognized state government, is vested with all state property, including title to the state funds accumulated during previous de facto régimes and to the cause of action which accrued to the state when its funds were misappropriated. See United States v. McRae, L. R. 8 Eq. 69, speaking of the right of the United States to succeed to all the property of the de facto government of the Confederate States after the suppression of the rebellion; United States v. Prioleau, L. J. (N. S.) 35 Ch. 7; King of the Two Sicilies v. Willcox, 1 Sim. (N. S.) 301. Practically all of the cases on the right of a state to sue proceed upon the theory that the state is continuous and the right of action really resides in the aggregate body of the people who are merely represented by particular governmental organizations which may change in character or personnel. When a de facto government is recognized and becomes the de jure government, the recognition relates back to the inception of the government, and it thereupon becomes lawful from the beginning. In Underhill v. Hernandez, 168 U. S. 250, 253, 18 Sup. Ct. 83, 84 (42 L. Ed. 456) the court said:

"If the party seeking to dislodge the existing government succeeds, and the independence of the government it has set up is recognized, then the acts of such government from the commencement of its existence are regarded as those of an independent nation."

See, also, Murray v. Vanderbilt, 39 Barb. 140, where the question of plaintiff's title rested on the validity of a decree issued by the de facto Nicaraguan government before its recognition by the United States. The court held that the subsequent recognition had a retroactive effect to give validity to the decree, as the decree was not void, since it had been enforced de facto up to the time of recognition. There can therefore be no serious question that this action was instituted and is being maintained by the proper authorities.

[6] It is claimed that the plaintiff has not capacity to sue, and that the action should be brought by the ambassador of the republic of Mexico, when appointed, in plaintiff's behalf. It was early settled in this state in the case of Republic of Mexico v. De Arangois, 11 How. Prac. 1, affirmed 5 Duer, 634, that a foreign government may maintain an action in the New York state courts in the name of the state as an aggregate body. The court said:

"In my opinion, the action can be maintained in the name of the republic as an aggregate body; and the modes of proceeding in cases of foreign corporations, and of other states of the Union may be resorted to for the regulations of the practice."

In adopting this rule the court departed from the earlier English precedent as established by the case of the Columbian Government v. Rothschild, 1 Sim. 103. In the case of The Sapphire, 11 Wall. 164, 20 L. Ed. 127, the United States Circuit Court not only held that a suit could be maintained in our courts by the emperor of France to recover damages for an injury to a vessel which was the public property of the state, but that the right to recover was not affected by the deposition of the emperor during the pendency of the appeal. This was on the theory that the continuity of the state itself and its title to the property of the state is not affected by changes in the personnel of the government. The English law is now to the same effect. United States v. Wagner, L. R. 2 Ch. App. 582.

[7-9] Coming to the question of jurisdiction: If the cause of action be regarded as sounding in tort, in so far as it suggests fraud of the defendant in embezzling money of the plaintiff confided to him in a relationship trust, yet it is at least a tort of the transitory type, since it relates only to personal property. It is competent for the plaintiff to waive the tort and sue upon the obligation to account which arises from the defendant's breach of his fiduciary obligations. The cause of action, being one for an accounting of the moneys had and received by the defendant in a fiduciary capacity, is really fundamentally contractual in nature, the obligation to account originating by implied contract. The common-law action, after which the equity action was modeled, is held to be both contractual and transitory. 1 Corpus Juris, 602. This court of general jurisdiction has jurisdiction of those causes of action arising in a foreign state or country between nonresidents, aliens, or foreigners, both in actions of a contractual nature and in cases of torts which are said to be "personal" and therefore transitory. The only real question as to jurisdiction, therefore, is whether the court should decline jurisdiction and relegate the parties to the courts of Yucatan, because the questions on the accounting, involving the lawfulness of defendant's expenditures, so peculiarly concern the internal and governmental affairs of Yucatan.

Defendant also claims that, having been governor for five weeks, his acts while governor are subject only to the congress of Yucatan and that he must be proceeded against by a court of impeachment. There is nothing in this, however, for the action taken by the United States government establishes for the purpose of this action that he was not the governor, but merely an interloper and usurper. In determining whether to decline jurisdiction, the court cannot ignore the admitted fact that the defendant does not intend to return to Yucatan, at any rate as long as General Carranza remains supreme, for he states that he would be executed. To decline jurisdiction would leave the state of Yucatan absolutely without remedy, for, assuming that under the practice of Yucatan service of process in a civil action brought by the government against Argumedo might be made by publication

or without the state, the same as in our practice, a judgment so recovered would have no extraterritorial effect and would be of no avail in this jurisdiction. Grubel v. Nassauer, 210 N. Y. 149, 103 N. E. 1113, 52 L. R. A. (N. S.) 161. It must be remembered that our courts have not felt justified in refusing jurisdiction to nonresidents in any action of a contractual nature, but only in tort actions not involving an injury to personal property, and that even in tort actions an exception is made of all cases where special circumstances justify the court, in its discretion, in entertaining the suit. Collard v. Beach, 81 App. Div. 582, 81 N. Y. Supp. 619; Wertheim v. Clergue, 53 App. Div. 124, 65 N. Y. Supp. 750. Most assuredly there are special circumstances in the case at bar requiring the court to retain jurisdiction. Any other rule would make this state the haven of absconders.

There is no force in the claim that the plaintiff's attorney had no authority to verify the complaint.

[10] The defendant Royal Bank of Canada, however, properly protests that, being a mere stakeholder, it should be protected from a double liability. The republic of Cuba has jurisdiction over the defendant Royal Bank of Canada and such of the assets, which are the subject-matter of this action, as are in the safe deposit box in Havana. It is not likely, but it is quite conceivable, that a Cuban tribunal might hold that jurisdiction over the safe deposit box in Havana rested entirely in the Cuban tribunal. Said defendant should therefore be protected by a bond of indemnity with proper security, holding the bank harmless against loss because of other proceedings in Cuba. The amount of the bond and the nature of the security may be discussed on the settlement of the order. Motion to continue the injunction pendente lite granted, with $10 costs.

Motion granted, with $10 costs.