LILLIAN HANNES, Appellant, v. KINGDOM OF ROUMANIA MONOPOLIES INSTITUTE, Respondent.*

First Department, June 19, 1940.

* Modfg. and affg. order and revg. judgment, 169 Misc. 544.

190

*Charles H. Tuttle* of counsel [*Herman E. Cooper*, attorney], for the appellant.

*Wilmurt B. Linker* of counsel [*Eugene Blanc, Jr.*, with him on the brief; *Delafield, Marsh, Porter & Hope*, attorneys, appearing specially for the Government of the Kingdom of Roumania and Kingdom of Roumania Monoplies Institute], for the respondent.

CALLAHAN, J. This appeal involves a claim of immunity from suit made by a foreign sovereign. It presents three important questions. The first is whether such a claim of sovereign immunity will prevail in behalf of a corporation wholly owned and operated by a foreign government; the second is whether the property attached herein is immune from attachment because it is the property of the foreign sovereign; and the third question is whether there was an effective waiver of immunity or consent to suit by the foreign government. While to some extent interrelated, we think that these questions may be separately considered.

The defendant is an autonomous corporate entity, created pursuant to the laws of the Kingdom of Roumania. It appears to be wholly owned, operated and controlled by the Kingdom of Roumania. The defendant was formed pursuant to the laws of Roumania for the purpose of exploiting certain monopolies, and of

issuing bonds and obtaining moneys from investors by the sale of such bonds, in connection with international loans.

The present action is brought by the plaintiff as the owner of a number of unpaid coupons attached to some of the bonds so issued and sold by the defendant in this country. The action was commenced by means of a warrant of attachment levied against moneys deposited with two New York banks, which moneys plaintiff claims belong to the defendant.

The plea of immunity is presented by the defendant, and by the Kingdom of Roumania appearing specially for that purpose. The Kingdom of Roumania's claim is also presented by the United States Attorney for the Southern District of New York, who appears at the suggestion of the Secretary of State of the United States. The United States Attorney transmits to the court the plea of sovereign immunity made by the Kingdom of Roumania, stating that it is presented " for such consideration as the Court may deem necessary and proper."

As the executive branch of our government does not indicate that it takes any position as to Roumania's claim of sovereignty, this court must determine such claim in the manner it deems proper upon the facts and the law.

The claim for immunity was initiated before Special Term by a motion requesting the court to decline jurisdiction because of said immunity, and to dismiss the complaint under rule 107 of the Rules of Civil Practice upon the ground that no jurisdiction existed over the defendant or the property of the Kingdom of Roumania because of its sovereignty. Defendant also moved to vacate the warrant of attachment for like reasons. These demands were based on the grounds that the action related to the public debt of Roumania; that the sovereign rights of said government were affected; that the defendant was an agent or instrumentality of the government, and that the property attached was the property of the Kingdom of Roumania.

Special Term granted the motion and declined jurisdiction of the action, holding that the claim of immunity was established on the record submitted.

Under our practice, affidavits were properly used upon this motion to set forth the facts supporting the claim of lack of jurisdiction, as such facts did not appear on the face of the complaint.

Rule 108 of the Rules of Civil Practice provides that if the plaintiff on the hearing of a motion under rule 107 presents affidavits denying the facts alleged by the defendant, or states facts tending to obviate the objection, the court may hear the same, or it may direct that the question of fact, which shall be clearly and dis-

tinctly stated in the order, be tried by a jury or a referee, the findings of which are to be reported to the court for action. If it sees fit to do so, the court may overrule the objection and, in its discretion, allow the facts to be alleged in the answer as a defense.

Plaintiff has submitted affidavits in opposition to this motion. Both the moving affidavits and the opposing affidavits consist largely of excerpts from the statutes under which defendant was created, copies of loan agreements under which the bonds involved herein were issued, certain guaranty agreements executed by the Kingdom of Roumania, and agreements of deposit under which the moneys attached herein were held.

The record, while it presents a fairly complete picture of the circumstances under which the defendant was created and under which the loan involved was made, in so far as may be gleaned from the above-mentioned documents, contains little or no proof of other facts or of the law of Roumania which might materially affect not only the meaning of the statutes under consideration, but also the questions of immunity and waiver which are presented. On the present record, we deem that these are issues of fact which should not have been determined on the affidavits alone, and that, until there be further proof taken concerning all the matters involved, the claims of immunity asserted by the defendant should not be allowed.

In order to understand the problem presented, it will be necessary to outline some of the facts disclosed by the documents contained in the record. It appears therefrom that the defendant was created to carry out a plan embodied in the Monetary Law of the Kingdom of Roumania. That law provided that the defendant was to be an autonomous institution which would enjoy legal personality, to which the State would transfer the right to exploit certain monopolies. The defendant was authorized to issue bonds to make international loans. The proceeds of the first loan to be made were to be paid by the defendant to the Kingdom of Roumania on account of the price fixed for the right to exploit the monopolies transferred to it.

This law also provided that defendant was to be a legally independent institution, enjoying full civil, personal and financial autonomy for the purpose of exploiting the monopolies, of engaging in commercial and financial operations, and particularly of issuing loans in the interest of the monetary stabilization and the economic development of said country.

Said law further provided that the operations of the defendant were to be deemed commercial, and defendant was to enjoy all the privileges and powers of commercial companies. The con-

cessions granted to defendant were to endure as long as defendant existed, and upon termination defendant was to retransfer same to the State. The defendant was to have its accounts passed and approved by the Roumanian Court of Accounts. In order to contract a loan, defendant was authorized to sell its bonds and to sign agreements to carry out said loan. The bonds issued by defendant were to have all the benefits of public loans of the government of Roumania, including exemption from taxation. The net proceeds of the sale of the bonds were to be paid to the government for governmental purposes.

Among the powers granted to defendant was the authority to acquire and dispose of property, to borrow money, to issue its bonds, to pledge its revenues as security therefor, to sue and be sued in its own name as plaintiff or defendant, and, within the limits fixed by the law of Roumania, to consummate any legal transaction permitted to commercial companies under said law.

Defendant's affairs were to be administered by a council, consisting mainly of public officers of Roumania, or their appointees.

An agreement, termed a convention, was entered into between the Kingdom of Roumania and the defendant which granted to the defendant the exclusive right to exploit specified commercial monopolies in Roumania. The defendant accepted these concessions, for which it agreed to pay the sum of $300,000,000. To carry out this payment, defendant was to deliver to the State the entire net proceeds of the sale of the first issue of its bonds. The balance of the sum of $300,000,000 was to be paid to Roumania as additional bonds were issued. The defendant was to pay to the State its entire gross receipts, less expenses, until the $300,000,000 was paid, and thereafter was to pay the State certain royalties.

Pursuant to the authority granted by the law above referred to, defendant entered into a loan agreement with certain American banking institutions for the issuance of bonds in the principal sum of $69,000,000. Said bonds were duly issued and sold, and plaintiff's suit is based on coupons attached to some of the said bonds.

Among numerous other provisions contained in the loan agreement was an article relating to security for the loan, in which a provision was made that, in case the defendant failed to pay the bonds or any interest or sinking funds thereon when due, and by reason of such failure legal proceedings were instituted against the defendant or its properties for the enforcement of payment, the holders of twenty-five per centum of the bonds were to have the right to give notice in writing to the banking institutions to

declare due the entire amount of said bonds. This clause appears to recognize the eventuality that suit might be brought against the defendant in this country.

The loan agreement contains many other provisions which we will not enumerate, although they express in more detail the powers to be exercised by the defendant.

The Kingdom of Roumania, as a primary obligor and not as surety, guaranteed payment of defendant's bonds, and pledged its credit for such payment. A separate agreement of guaranty was also executed by the Roumanian government, which contained various provisions concerning the rights of bondholders and of the banking institutions acting as defendant's fiscal agents.

The loan agreement above referred to was dated February 1, 1929. On October 10, 1934, there having been some default suffered in payments due under the bonds, a new agreement was entered into between defendant and an American bank which had been selected to act as defendant's special agent to attempt to relieve the defaults by a plan of part payment. This new agreement provided for the temporary suspension of the sinking fund payments, and for partial instead of complete payment of interest coupons due and unpaid. To carry out the last-mentioned provisions for part payment, certain sums of money were to be deposited by the defendant with the agent. The agreement to deposit provided that the moneys placed with the bank were to be held for the benefit of the holders of coupons who surrendered the same. The new agreement also provided that any moneys remaining after such payments were made were to be held by the special agent until the maturity of the bonds, and any balance not used at the time were to be returned to the defendant. It was provided that any balance was not to be used on account of any coupons not surrendered, or for any other obligation of the defendant or of the Kingdom of Roumania. All of the moneys upon which the present attachment was levied were held by the bank pursuant to the loan agreement of February 1, 1929, or in accordance with the new agreement of October 10, 1934.

The rights of plaintiff may well be different with respect to various parts of the attached moneys. This may depend on the source of the money, the agreement under which it was deposited, and the rights of third parties concerning same.

At least some of the moneys attached had been allocated for the benefit of special coupon holders. Whether these moneys had been impressed with a trust for such purpose, we do not consider necessary for us to determine at this time, for no claim is presented by the present motion, except the question of sovereign immunity.

Although plaintiff is seeking to compel payment of part of the loan and is not suing to enforce any contract made in connection with a commercial transaction arising from the exploitation of the monopolies granted defendant, we do not see that this makes any difference in the legal questions presented. Defendant was authorized to borrow money in this country and to contract with purchasers of its bonds with respect to repayment. These purchasers should have the same rights to avail themselves of the authority and privileges granted defendant by the Roumanian government as would other commercial creditors.

In considering the three questions enumerated, we must determine whether there were questions of fact presented by the present record with relation to any of them, and whether such questions should have been decided on the affidavits submitted.

We consider first the degree of sovereign immunity, if any, possessed by defendant corporation. Plaintiff concedes the rule of law to be that immunity from suit is afforded a foreign sovereign power. She points out, however, that she is not suing the Kingdom of Roumania, but a corporation which is an autonomous, legal entity; that among the purposes for which the corporation was created was that of carrying out various commercial enterprises, including the borrowing of money and the issuing of commitments to repay the money borrowed. She claims that defendant corporation has no immunity from suit as a foreign corporation nor as the instrumentality of a foreign sovereign.

The opposing claim of the defendant and of the Kingdom of Roumania is that the defendant has sovereign immunity as an instrumentality of the Kingdom of Roumania carrying out that government's public functions.

There is no doubt that the law granting immunity to the persons of foreign sovereigns grants like immunity to those representing them, such as ambassadors or similar agents, and that this immunity extends to their instrumentalities and property. (*Schooner Exchange* v. *M'Fadden*, 11 U. S. [7 Cranch] 116.) It does not follow that, because immunity is granted to an ambassador of a foreign government or one of its instrumentalities, a suit may not be maintained against a corporation formed pursuant to the laws of the foreign government, although said corporation is owned by the government, especially when such corporation is engaged in commercial activities. We sometimes permit agents of our own government to be proceeded against where the United States is not a necessary party. (*United States* v. *Lee*, 106 U. S. 196.) But, as will hereafter be pointed out, the question of immunity of a local government from suit depends on principles somewhat different from that of immunity of a foreign sovereign State.

Under our conception of the personality of a corporation, suit against such an entity is not an action against its stockholders. The claim of the Roumanian government appears to be that it is the owner of the defendant through stockholding interests. It concedes that the legal title to the funds involved herein is in the defendant. Under municipal law, no ordinary private litigant could claim ownership of funds where legal title was vested by it in its agent or wholly-owned subsidiary. The creditors of such subsidiary would prevail over stockholding interests.

Foreign corporations as such are not entitled to immunity, even though their functions may include to some extent the performance of public duties. (Wheaton on International Law [5th ed.], p. 32; *United States* v. *Deutsches Kalisyndikat Gesellschaft*, 31 F. [2d] 199.)

In modern times there has developed the practice, followed by our own as well as foreign governments, of using wholly-owned corporations as agencies for doing the work of the government. (*Keifer & Keifer* v. *Reconstruction Finance Corp.*, 306 U. S. 381.)

Divergent views have been expressed by the courts concerning the extent to which immunity from suit should exist as to the acts of these wholly-owned and controlled corporations when acting for a foreign government. (See "The Immunity of Foreign States When Engaged in Commercial Enterprises: a Proposed Solution," 27 Mich. Law Rev. 1928–1929, p. 751.) Some courts have taken the position that the foreign sovereign, when it permits its corporate agency to enter into commercial contracts, should be obligated to perform its contracts according to the terms thereof, and be subject to suit for failure to do so. (*Royal Italian Government* v. *National Brass & Copper Tube Co.*, 294 Fed. 23; *Molina* v. *Comision Reguladora del Mercado de Henequen*, 91 N. J. Law, 382; 103 A. 397.) Contrary views have been expressed in other jurisdictions. (*Mason* v. *Intercolonial Railway*, 197 Mass. 349; 83 N. E. 876.) It has been held that corporations acting for foreign governments, when engaged in commercial transactions here, are subject to statutes regulating business. (*United States* v. *Deutsches Kalisyndikat Gesellschaft, supra.*)

In considering the question of the degree of immunity, if any, possessed by the defendant, we must bear in mind, however, that questions of immunity of foreign sovereign powers and their agents are ordinarily determined under international law as matters of comity, involving, therefore, considerations of expediency in friendly, international intercourse, rather than the principles of municipal law.

The development of the practice of States undertaking commercial activities has led to a distinction in considering the question

of immunity between acts of a private nature said to be *jure gestionis* as contrasted with acts of a public nature which are *jure imperii*. Controversies in the first class are sometimes held to be subject to the jurisdiction of foreign courts, while those in the latter are not. This distinction has been recognized in the courts of Roumania, among other nations. (See *Banque de Crédit c. l'Etat Polonaise*, 50 Clunet, 663, Court of Ilfor 1920; 31 Columbia Law Rev. 662.) While the English and French courts do not appear to separate public from private acts when considering immunity, they do recognize that immunity does not apply to funds not possessed by the State. For instance, it has been held that the English courts had jurisdiction to deal with a trust fund created by a foreign sovereign to meet a commercial obligation. (*Larivière* v. *Morgan*, L. R. 7 Ch. App. 550 [1871]; revd., on other grounds, 7 House of Lords, 423 [1875].) It has been held by the English courts that they can declare a right of property in moneys of a sovereign in the hands of private persons and enforce private rights against such property. (*Duff Development Co.* v. *Government of Kelantan*, [1923] 1 Ch. 385, 400. See, also, *United States* v. *Prioleau*, 35 L. J. Ch. 7 [1866].) The French courts have upheld a suit against the Roumanian government based on goods furnished that government by the plaintiff for resale by it to its nationals. (*Etat Roumain c. Pascalet et Cie*, 1924, Dalloz Hebd. 260 [Commercial Court of Marseilles, 1924].)

The Belgian courts have held that, while the floating of a State loan is a public function of a foreign State, nevertheless their courts are competent to deal with the contractual obligations arising out of transactions preliminary to the floating of the loan. (*Feldman c. Etat de Bahia*, [1908] Pasicrisie Belge 2.55 [Court of Appeals, Brussels, 1907].)

While the distinction between acts *jure gestionis* and acts *jure imperii* does not appear to have been recognized in the leading case of *Berizzi Bros. Co.* v. *S. S. Pesaro* (271 U. S. 562), in that case the property in suit was in the possession of the foreign government, and no corporate agency had title to the property involved.

There does not appear to be any controlling authority in the Supreme Court of the United States or of the appellate courts of this State on the question of the extent of immunity to be afforded a corporation owned by a foreign government. Before we attempt to state such a rule in this case, we deem that all of the essential facts surrounding defendant's powers, liabilities, and its relation to the Roumanian government should be definitely established. We think it will suffice at this time to indicate what facts might be material to the determination of that question.

In determining the extent to which we should grant immunity to the defendant, an alleged incorporated agency of a foreign sovereign, we should consider not only that it is engaged in commercial enterprise, dealing with our citizens to some extent like an ordinary business corporation, but we must also consider how closely it is related to the foreign sovereign. We should ascertain whether the acts of the agency are public or private acts, and whether the moneys attached are the property of the government of Roumania held by its agents, or money of defendant held in its private capacity as a corporate entity.

While not necessarily controlling, we think it might be appropriate to consider the principles of law that have been applied in determining to what extent immunity is afforded local governmental agencies. We might consider it appropriate to afford agencies of a foreign sovereign power rights of immunity equal to those afforded our own governmental agencies.

The question of immunity of agencies of our own government has been before the courts quite frequently. (*Sloan Shipyards* v. *United States Fleet Corporation,* 258 U. S. 549; *Merchant Fleet Corp.* v. *Harwood,* 281 id. 519; *Keifer & Keifer* v. *Reconstruction Finance Corp., supra.*) The principle announced by these cases appears to be that, in so far as our own agencies are concerned, the question of immunity depends largely on the intent of Congress with respect to granting or withholding the same. If we were to apply a like principle to the claim in suit, the question of intention of the Roumanian government in this case with respect to the immunity to be possessed by defendant, would present an issue of fact. This intention must be gathered from a study of the foreign law, including the foreign statutes. As an issue of fact it should not have been determined upon the meagre statements concerning same in the affidavits submitted. The question of intention being one of fact, all the relevant circumstances should receive due weight.

So far as we may presently gather, it was undoubtedly intended that the Roumanian government should ultimately receive financial benefit from the sale of its monopolies to the defendant. There are, however, other and divergent facts revealed which show that the defendant was granted all the powers of commercial corporations, not only for the purpose of exploiting the monopolies, but for the purpose of contracting to borrow money as well. Among the powers granted to defendant corporation was that to sue and be sued. The defendant as an autonomous, corporate body appears to have purchased the monopolies and to have agreed to pay a fixed price therefor. It was to pay royalties after it had paid the principal amount of the purchase price. Whether it was the inten-

tion to grant any private rights or to have the defendant act solely for the government is not clear. Further facts should be developed relevant to this question of intention.

The second question to be considered is whether the property attached is immune from suit. The plaintiff claims that no such immunity exists; that legal title to the moneys attached was in the defendant corporation; that said moneys are not the property of the government and are subject to the claims of its commercial creditors. The defendant and the Kingdom of Roumania claim that the moneys attached were the property of the Kingdom of Roumania held by the defendant as the government's agent and for governmental purposes, and that, accordingly, said property is immune from attachment. While the declaration of the Minister of Roumania that the property attached is held by the defendant for governmental use is undoubtedly entitled to great weight as a statement of the contentions made, we do not consider that such declaration is controlling or prevents this court from weighing the facts, where our own government submits this question to the court for decision. (*Compania Espanola* v. *Navemar*, 303 U. S. 68; *Lamont* v. *Travelers Ins. Co.*, 281 N. Y. 362.)

The law with respect to the question of immunity of the property of a foreign sovereign power, when owned and possessed by it but used in commercial enterprises within our jurisdiction, was considered in *Berizzi Bros. Co.* v. *S. S. Pesaro (supra)*. The rule was stated to be that property of a foreign government, in possession of that government, was immune from suit, although said property was being used by the government in this country in a commercial enterprise. The case cited was an action *in rem* against a merchant vessel owned by a friendly foreign power and operated by said government in the carriage of passengers and merchandise for hire. The ship was held to be immune from arrest under a libel in admiralty by a private suitor, the Supreme Court of the United States stating that the immunity existed even though the ship was used for commercial advantage. (See, also, *Compania Espanola* v. *Navemar, supra*.)

It is also a well-recognized rule of the law of nations that immunity of the property of a foreign government exists where the property is held by its agent for governmental purposes. (*Le Parlement Belge*, 5 P. D. [1880] 197, 214.)

In *Lamont* v. *Travelers Ins. Co. (supra)* our Court of Appeals recognized that immunity from suit would extend to the property of a foreign government, even though deposited here for the purpose of paying debts of the said government. That decision appeared to recognize that immunity would have to be afforded such property, where, despite the circumstances of its deposit, it remained

the property of the foreign government. In the *Lamont* case (*supra*), however, the court permitted the litigation involved to proceed until the right of property in the foreign government was established. There the action was for an accounting, and all the parties to the suit contended that no right of property existed in the foreign government. The court held that a mere assertion of ownership by the foreign government was not sufficient to arrest the suit, in the absence at least of some affirmative statement by our own government as to the rights of the foreign power in the property. (See, also, *Compania Espanola* v. *Namevar, supra*.) It must, therefore, be deemed to be the law as established by these cases that the right of immunity of the property of a foreign government exists when said property is owned by the foreign government and possessed by it or by its agent for governmental purposes. None of the decided cases, however, involves the additional factors found in the present case, *i. e.*, that a separate corporate entity, formed by the government, held title to the property within our jurisdiction, and had deposited the property with third persons, primarily for corporate purposes. Our case is *sui generis* in these respects.

We do not wish to indicate that the question of legal title is necessarily controlling in determining the matter of immunity. In *United States Grain Corp.* v. *Phillips* (261 U. S. 106, 113) it was stated that where corporations are used as governmental agencies, legal title is not always the controlling factor in determining whether the property is that of the government. That decision indicated that we are not to look solely at the legal title, but at the facts beneath the form, in determining such question. The case last cited involved a claim which would not have been recognized as valid, if the property had been that of our government. Title to the property was in the United States Grain Corporation, a governmental agency. Despite this fact, the public nature of the property was recognized.

Whether any part of the property deposited by the defendant in the present case was destined for public use presents some issues of fact, though to some extent issues of law are also presented. We think that the relevant facts should be determined after a trial and not upon affidavits.

The third problem to which we must address ourselves is whether there has been a waiver of immunity or consent to suit by the foreign sovereign power in this case. Plaintiff claims that the Kingdom of Roumania, assuming that it might have otherwise claimed immunity because the property involved was its property, has expressly waived any immunity by the terms of the law creating the defendant which law expressly consented to defendant being

sued. The Roumanian government asserts that the consent to suit contained in the law creating the defendant should be construed to be merely a consent to suits brought in the courts of Roumania and that in any event it amounted merely to an engagement of honor, which might not be taken advantage of in an action at law, and which might be withdrawn by the government at any time.

To determine the question of waiver, we are required to construe the foreign statute, and also to determine whether the acts of the foreign government amount to a withdrawal of the consent, if any existed. We have very little in this record in the way of evidence on these points, except the statute itself and the claim made by the government in asserting its immunity. In the absence of proof showing that Roumanian law requires a different construction, we would not be inclined to construe the consent to be sued found in the Roumanian statute submitted to us as merely conferring a right to suitors to proceed in the Roumanian courts. As we read the provision, it would indicate a broader right. In fact, in the loan agreement executed by defendant, defendant itself construed the consent to suit to mean that defendant might be sued in the courts of this country. Our view might be altered, if we had further proof concerning the law of Roumania affecting the meaning to be given this statute.

Concerning the withdrawal of the consent, our courts have recognized the right of a local sovereign power to withdraw consent to be sued, where granted by it, at least where such consent has been expressed in a statute. Where granted by statute, it may withdraw by a later statute. (*Beers* v. *State of Arkansas,* 61 U. S. 527.) We find no claim in the present record that any new statute was adopted by the Kingdom of Roumania concerning the right to sue defendant, nor have we any proof that corporate powers or liabilities created by a Roumanian statute may be affected by executive action. Though a foreign government may not carry the claim of immunity so far as to come in and go out of court at will (*Porto Rico* v. *Ramos,* 232 U. S. 627), it might well be afforded the right to withdraw statutory consent by like statutory action. In this country there is vested in no officer or body the authority to consent to suit, except in the law-making power. (*United States* v. *Lee, supra.*) Ordinarily, the power to take away would follow the power to grant.

We have nothing in the present record to indicate where the power rests under Roumanian law with respect to the granting or withdrawing of immunity of its corporate agencies from suit. We have merely the legislative declaration referred to and the expression of corporate powers found in the documents. We have at least *prima facie* proof of consent that defendant might be sued.

It must be remembered that we are not considering the question of immunity of the sovereign itself from suit. Unquestionably, in such a case the existence of consent under principles of international law would be determined as of the time when suit was commenced. The sovereign might refuse to submit to the jurisdiction of the court, despite its former consent. We are considering whether a corporate creature of the State, assuming it was acting in some respects as a governmental agency, might have its consent to suit withdrawn after one treating with it had acted under a statute granting such consent. We think that as to one in a situation such as plaintiff's, any attempted withdrawal by a government owning the stock of such a corporation would be ineffectual in the absence at least of circumstances showing that the corporation was merely an instrumentality of the government.

It was error to refuse jurisdiction of this suit without at least requiring further proof concerning the facts relating to this question of withdrawal.

We deem that the proper disposition of the motion by Special Term in this case would have been to appoint a referee to try the question of fact relating to jurisdiction as a separate issue. (Rules Civ. Prac. rule 108.)

In so holding, we do no offense to the sovereign independence or dignity of a foreign nation. This action is pending against a private corporation, and the claim of immunity is presented by it. No decision of that question could compel the sovereign to submit to jurisdiction. If it is decided, after hearing all the facts, that the defendant or the property attached is immune, jurisdiction will be declined. If the contrary decision is arrived at, the litigation will proceed only against a private corporation and its property. (See *Compania Espanola* v. *Navemar, supra; Lamont* v. *Travelers Ins. Co., supra; De Simone* v. *Transportes Maritimos Do Estado,* 200 App. Div. 82.)

That the attachment was vacated by the order appealed from and no stay of said vacatur has been procured, would not prevent the revival of the attachment, at least for the purpose of supporting jurisdiction, if the order is ultimately reversed (*Pach* v. *Gilbert,* 124 N. Y. 612), subject to the rights of *bona fide* transferees.

The judgment should be reversed and the order modified by directing a separate trial by a referee of the issues indicated, and as so modified affirmed.

MARTIN, P. J., UNTERMYER, DORE and COHN, JJ., concur.

Order unanimously modified by directing a separate trial by a referee of the issues indicated, and as so modified affirmed. Settle order on notice drawn in accordance with rule 108 of the Rules of Civil Practice.