## SULLIVAN v. STATE OF SAO PAULO.

### SAME v. STATE OF RIO GRANDE DO SUL.

#### Nos. 315, 316.

Circuit Court of Appeals, Second Circuit.
Aug. 4, 1941.

Isidor J. Kresel, of New York City (Morris F. Goldstein, Wm. Peyton Marin, and Abraham P. Inselstein, all of New York City, on the brief), for appellant.

Wilmurt B. Linker, of New York City (Delafield, Marsh, Porter & Hope, Ramon Siaca, and Gardner C. Klein, all of New York City, on the brief), for respondents.

Before L. HAND, CHASE and CLARK, Circuit Judges.

CLARK, Circuit Judge.

, Defendants are constituent states of the United States of Brazil. These actions against them, in respect of principal and interest alleged to be due on certain of defendants' bonds, were begun in the New York Supreme Court by attachment of New York bank accounts of defendants and service by publication. After both actions had been removed to the federal court, defendants appeared specially to move dismissal of the actions and vacation of the attachments on the ground of their sovereign immunity to suit.

While these motions were pending, the United States Attorney for the Eastern District of New York submitted to the court on the request of the Secretary of State a note from the Brazilian Ambassador asserting defendants' immunity to suit, and asserting further that the interest in the funds of the federal government of Brazil was such as to render them immune to attachment. Attached to the note were copies of certain Brazilian decrees, by which the Brazilian federal government's interest was allegedly established. The communication from the United States Attorney expressly disavowed any intention to appear in the suit on behalf of Brazil, the defendants, or the United States, and nowhere vouched for the validity of the claims.

Shortly thereafter the court addressed to the Secretary of State a letter asking whether the State Department had "recognized and allowed" the claims of immunity within the meaning of those words as used in Compania Espanola v. The Navemar, 303 U.S. 68, 74, 58 S.Ct. 432, 82 L.Ed. 667. In answer to this it was informed that the "Department * * * had no doubt as to the accuracy of the statements" in·the Brazilian Ambassador's note "as to the status of the Brazilian States" and likewise as to "the ownership and disposition of the funds in question," but that "it is the practice of the Department to leave such questions [of granting or withholding immunity] for determination by the courts, applying the principles of international law to the facts and circumstances of the particular cases."[1]

In a second letter the court pressed for a categorical answer to the question whether or not the claims had been "recognized and allowed," and received an answer in the following terms:

"The Department's earlier statements on this subject were not intended to indicate that it had 'recognized and allowed' the claim of immunity as a conclusion of law, but rather were intended, as indicated, to show that the Department felt that a prima

---

1 This letter and the later letter are both quoted in full in the report of the opinion below. D.C.E.D.N.Y., 36 F.Supp. 503, at pages 504, 505.

facie case had been made out by the Government of Brazil, which justified the Department in having the statements presented to the court for its consideration. The Department's action necessarily implied an acceptance, as true, of the statements of fact made by the Brazilian Government. It was felt, however, that the ultimate decision of the question of immunity, in view of the political status of the States of Rio Grande do Sul and Sao Paulo, and of the relationship of the Brazilian Government to the funds in question, should be left to the court. The action taken by the Department in these cases was similar to that taken in other cases where the Department felt that there was merit 'to the contention of the foreign government but did not undertake to pass upon such contention as a conclusion of law. I may state, however, that, aside from the question of the political status of the two defendant States, it is the view of the Department that the interest of the Government of Brazil in the funds, as explained in the Brazilian Ambassador's note of July 11, 1940, is of such character as to entitle them to immunity from attachment by private litigants."

On the basis ,of these representations, and without any hearing on either the nature of Brazil's interest in the funds or the status of the defendants, the complaints were dismissed and the attachments vacated.

■ The parties are in serious dispute as to the significance to be attributed to the actions of the State Department and the District Attorney. Were these ·officials acting merely as the automatic conduit of the Brazilian Ambassador's claim, or did they also place upon it the stamp of indorsement of the Department? Evidently some favorable implication must be drawn, for sometimes the Department has declined to act at all, as in Compania Espanola v. The Navemar, supra, and Molina v. Comision Reguladora, 91 N.J.L. 382, 103 A. 397, and has even positively expressed itself as opposed to a claim of immunity. The Pesaro, D.C.S.D.N.Y., 277 F. 473. It is said that in only two instances, one involving the arrest of a foreign warship, The Schooner Exchange v. M'Faddon, 7 Cranch 116, 11 U.S. 116, 3 L.Ed. 287, and the other a suit directly against a foreign sovereign, Hassard v. United States of Mexico, 173 N.Y. 645, 66 N.E. 1110, has the Executive ever actually appeared in a suit to move dismissal on these grounds. Deák, The Plea of Sovereign Immunity,

40 Col.L.Rev. 453, 461. Whether or. not it does so is not necessarily a test of its attitude toward the validity of a claim, or its "recognition and allowance" thereof within the sense of Compania Espanola v. The Navemar, supra. Cf. The Attualita, 4 Cir., 238 F. 909; Puente v. Spanish National State, 2 Cir., 116 F.2d 43.

■ That test should naturally be supplied by the Executive's representations, not the technical nature of its appearance. Here the Executive chose to transmit the claim, which act alone has been held to be an implied recognition. Miller v. Ferrocarrill del Pacifico de Nicaragua, Me., 18 A.2d 688. Contra: Lamont v. Travelers Ins. Co., 281 N.Y. 362, 24 N.E.2d 81; Hannes v. Kingdom of Roumania Monopolies Institute, 260 App.Div. 189, 20 N.Y. S.2d 825. And when pressed, it did much more. It not only vouched for the accuracy of the statements of fact made by the Brazilian Ambassador, but also declared it to be "the view of the Department that the interest of the Government of Brazil in the funds, as explained in the Brazilian Ambassador's note of July 11, 1940, is of such character as to entitle them to immunity from attachment by private litigants." This appears to be a clear recognition of the claim of the Brazilian federal government so far as the Department is concerned, and the latter's refusal to recognize it "as a conclusion of law" can hardly be more than modest concern not to usurp the constitutional function of the courts.

We have no hesitation, therefore, in accepting these communications as the official representation of Executive acceptance of the Ambassador's claims. And therefore we accept for the purposes of decision herein the recitals of fact made by the Ambassador. Compare Banco de Espana v. Federal Reserve Bank, 2 Cir., 114 F.2d 438, 443. Next we must inquire whether the conclusion of immunity drawn by the Department from these facts is of the kind which the courts should and must accept as final.

■ Courts will undoubtedly accept as conclusive Executive pronouncements on whatever might be considered a "political," as opposed to a "judicial," question, Doe ex dem. Clark v. Braden, 16 How. 635, 57 U.S. 635, 14 L.Ed. 1090, including the question whether one is a sovereign, Oetjen v. Central Leather Co., 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726; Duff Development Co. v. Kelantan Government,

[1924] A.C. 797, and the question whether one is a sovereign's privileged diplomatic representative. United States v. Ortega, C.C.E.D.Pa., Fed.Cas.No.15,971; Engelke v. Musmann, [1928] A.C. 433; see Ex parte Baiz, 135 U.S. 403, 10 S.Ct. 854, 34 L.Ed. 222. Such questions as these must have been within the contemplation of the court in the Navemar case, when it said (303 U.S. page 74, 58 S.Ct. page 434, 82 L.Ed. 667): "If the claim is recognized and allowed by the Executive Branch of the government, it is then the duty of the courts to release the vessel upon appropriate suggestion by the Attorney General of the United States, or other officer acting under his direction." See Deák, supra, 40 Col.L.Rev. at page 462. For Executive action in respect to such questions, if not actually determinative of them, is at least the best evidence which it is possible to adduce. United States v. Liddle, C.C.E.D. Pa., Fed.Cas.No.15,598.

■ The adjudication of present rights to property within a court's jurisdiction is, however, a purely judicial function, which no Executive department of the government is constitutionally or practically equipped to discharge. Banco de Espana v. Federal Reserve Bank, supra. Every court has the general power to pass on questions affecting its own jurisdiction, Stoll v. Gottlieb, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104; and where that jurisdiction is in rem or quasi in rem, as based upon property in its control, no Executive action can deprive the court of jurisdiction —or even constitute evidence of rights in the property—except in so far· as such rights depend on the settlement of "political" questions, as on issues of sovereignty of a party or his assignor. United States v. Bank of New York & Trust Co., 296 U.S. 463, 56 S.Ct. 343, 80 L.Ed. 331; Berizzi Bros. Co. v. S. S. Pesaro, 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088.[2] See United States v. Belmont, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134.

■ So far, therefore, as decision turns upon the immunity of defendants' New York funds to attachment by reason of Brazil's alleged interest, it must rest upon what the court finds to be Brazil's actual interest. The Ambassador's note admitted that the funds belonged to the defendant states, in whose names they stood. His claim of a federal "interest" therein was predicated on the so-called "Arunha Plan" for the partial disposal to the states of available foreign exchange with which to meet their defaulted foreign obligations. The promulgation of this plan, February 5, 1934, followed an earlier prohibition on the sale of foreign exchange except as authorized by decree or by a named committee. Neither the prohibition nor the plan requisitioned existing or future foreign exchange assets. On the contrary, the plan provided that the obligations so met were to remain the obligations of the respective states, to which foreign exchange would be supplied by the Bank of Brazil under stated quota provisions. Nowhere does the interest of the federal government appear to be anything more than the interest of a government in the conservation of a rationed commodity. Indeed, the federal government of Brazil might as rightfully claim an interest in any foreign exchange assets possessed by any Brazilian citizen, regardless of where held, as it does to the funds here in issue, and render all Brazilian citizens, as well as Brazilian states, completely immune to suit except in Brazilian courts. So, incidentally, might Germany and Italy, which have comparable systems for the rationing of available foreign exchange.

This, therefore, is a claim for a rather radical extension of sovereign immunity, one for which direct precedent appears to be lacking. In The Attualita, supra, the vessel sought to be released had been "requisitioned" by the Italian government, and was admittedly being used in its service. Nevertheless, immunity was denied because the vessel had not actually been confiscated or removed from the possession of its private owner. See, also, Ex parte Muir, 254 U.S. 522, 41 S.Ct. 185, 65 L.Ed. 383. We are not content to rest decision upon this claim.

■ We believe, however, that the defendant states should be accorded sovereign immunity in their own right. The representation of the Brazilian Ambas-

---

[2] Immunity from arrest was extended to a ship owned and possessed by the Italian government, but operated in the carriage of merchandise for hire, although the State Department had expressed to the district court, during the course of the proceedings, its "view" that such vessels should not be entitled to immunity. See The Pesaro, supra, 277 F. at page 479. The Supreme Court decided the question without reference to the State Department.

sador to the State Department has presented facts, accepted by the latter as true, which establish that the Brazilian states occupy in the Brazilian union a status comparable to that of our own states in the American union. It is well settled that the latter are immune from suit on general principles of international law in cases not covered by the Eleventh Amendment. Monaco v. Mississippi, 292 U.S. 313, 54 S. Ct. 745, 78 L.Ed. 1282. That they have sacrificed control over foreign affairs does not deprive them of this status, Duff Development Co. v. Kelantan Government, supra; nor does the failure of our own government to maintain diplomatic relations with them. In re Patterson-MacDonald Shipbldg. Co., 9 Cir., 293 F. 192, certiorari denied 264 U.S. 582, 44 S.Ct. 331, 68 L.Ed. 860; Wulfsohn v. Russian Socialist Federated Soviet Republic, 234 N. Y. 372, 138 N.E. 24.

As was said in Kawananakoa v. Polyblank, 205 U.S. 349, 353, 27 S.Ct. 526, 527, 51 L.Ed. 834, which recognized the immunity to suit of the territory of Hawaii, although the territory derived all its powers by delegation from the United States Congress: " * * * the doctrine [of sovereign immunity] is not confined to powers that are sovereign in the full sense of juridical theory, but naturally is extended to those that, in actual administration, originate and change at their will the law of contract and property, from which persons within the jurisdiction derive their rights." See, also, Smith v. Weguelin, L.R. 8 Eq. 192, 212-214, 1869.

In the sense so defined, the defendant states are admittedly sovereign, and should therefore possess the immunity which is conceded to a friendly foreign sovereign. Puente v. Spanish National State, supra. Several continental authorities supporting suability of a constituent state of a federation have been pressed upon us, but the general law appears unsettled, Harvard Research in Int. Law, Competency of Courts in Regard to Foreign States, 1932, 479-488, with England recognizing immunity under comparable conditions. Duff Development Co. v. Kelantan Government, supra, [1924] A.C. at page 814; Smith v. Weguelin, supra, L.R. 8 Eq. at pages 198, 212-214. Compare State of Yucatan v. Argumedo, 92 Misc. 547, 157 N.Y.S. 219. It seems clear to us that the law should accord the immunity which we claim for our own states (Monaco v. Mississippi, supra) to foreign states whose constitutional position is the same; and therefore we affirm the dismissal of the complaints and the vacation of the attachments.

Since the above opinion has failed to win the approval of my brother who desires to rest on another theory, perhaps I should say a word about the latter in view of its importance. Suability of foreign governments is indeed a delicate issue where the Department of State refrains from making the question a political one—whether from design or by masking its real views in the polite language of diplomacy. Angell, Sovereign Immunity—The Modern Trend, 35 Yale L.J. 150, 168. Recent vigorous comment accuses our courts of going beyond those of other nations in denying remedies against defaulting countries on worthy claims of our own citizens. 50 Yale L.J. 1088; cf. Brinton, Suits against Foreign States, 25 Am.J.Int.L. 50. But the theory here announced seems to me a step beyond any immunity yet granted, for it immunizes property in this country from attachment for a debt due here merely on the assertion of a foreign sovereign, not of title or a recognized property interest, but of a plan for rationing foreign exchange. No claim of federal ownership of the funds is even asserted; and the State Department vouches only for the facts of the plan, for such effect as our courts may think they have, while it carefully refrains from suggesting any political connotations or denotations from such judicial adjudication. This leaves it purely a local property, not a political, issue, of the kind we have said the courts must adjudicate. Banco de Espana. v. Federal Reserve Bank, supra, 114 F.2d at page 442. And the rationale commits us to recognize such a scheme as applied as well to the property of private citizens of the foreign government, once the latter makes general claim to an interest in rationing the payment of their debts; our State Department can hardly refrain from vouching for the existence of the scheme (when it does exist) without being manifestly unfriendly. Such an invitation to foreign governments to immunize and sequester funds of their nationals in this country I do not believe they will be slow in accepting.

On the other hand, immunity of public states when, and only when, they are like our own states, as vouched for by the State Department, seems to me not only natural and limited and reasonable, but also a

privilege we would find ourselves hard put to find reasons to deny without unfriendly implications in our denial. For we assert such immunity for our states, Monaco v. Mississippi, supra, and for the territory of Hawaii, Kawananakoa v. Polyblank, supra; and the doctrine seems already recognized, not only by the English cases cited supra, but by our own courts as to Australia, In re Patterson-MacDonald Shipbldg. Co., supra, and political subdivisions of Portugal, De Simone v. Transportes Maritimos do Estado, 199 App.Div. 602, 191 N.Y.S. 864, and in according the right to sue to Yucatan, State of Yucatan v. Argumedo, supra—though not immunity to a Yucatan hemp corporation. Molina v. Comision Reguladora del Mercado de Henequen, 91 N.J.L. 382, 103 A. 397. The privilege thus would not be open to all foreign political subdivisions, only to those of the kind for which our law itself demands immunity. Compare 26 Corn.L.Q. 727, 729.

Affirmed.

L. HAND, Circuit Judge (concurring).

The facts on which the jurisdiction of the district court can rest are undoubted; it had a res within its control, and the statute gave it substantive jurisdiction over the controversy. When I say it had a res within its control, I mean that it could direct the obligor to pay the deposit to the plaintiff, and that its order would be recognized everywhere as a valid discharge. Again, it had substantive jurisdiction over the controversy, because it had unquestioned power to decide the case; for example, if the defendant had appeared. There was therefore no lack of jurisdiction, but there was a grave question whether the court should exercise it. When a court seizes property from the actual possession of a foreign state with which we are in amity and that state intervenes in due form to assert a claim to it, the court will desist even though our Department of State does nothing. The Pesaro, 255 U.S. 216, 41 S.Ct. 308, 65 L.Ed. 592; Ex parte Muir, 254 U.S. 522, 41 S.Ct. 185, 65 L.Ed. 383; The Pesaro, 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088; The Navemar, 303 U.S. 68, 58 S.Ct. 432, 82 L.Ed. 667; The Carlo Poma, 2 Cir., 259 F. 369. When, however, the foreign state is not in possession of the property seized, it cannot secure a dismissal merely by showing that it has an interest in preventing the seizure. The Navemar, supra, 303 U.S. 68, 58 S.Ct. 432, 82 L.Ed. 667; The Attualita, 4 Cir.,

238 F. 909. I can think of no rationale which will reconcile these doctrines except that the violation of a foreign state's possession is so grave an indignity as ipso facto to embarrass the relations between that state and the state of the forum; it is better that the wrongs of the court's nationals should be left to negotiation between the powers. Obviously that does not apply to all suits which in any degree affect the interests of a foreign state; those interests may be trivial, the foreign office of the state of the forum may prefer incurring the slight friction which the prosecution of the suit may arouse to depriving its nationals of their normal redress and to settling the controversy by negotiation. The question is certainly not for the foreign state's sole decision; it must rest with the foreign office of the state of the forum.

In the case at bar it was necessary to the success of the plan of putting the national Brazilian credit upon a firm basis that the credit of the federate states should be included; our Department of State by vouching for the "statements of fact" in the ambassador's protest has made this datum. Moreover, it needs no argument to prove that the plan cannot succeed if Brazilian credits are open to attachment by our nationals. That alone would not have been enough; the district court had to have the added assurance of our Department of State that the suit would, or might, prejudice the relations between Brazil and ourselves; and, although the language was very guarded, I think its import went so far. The mere fact that the Department saw fit to transmit the protest at all was evidence that it regarded the issue as substantial; it might well, as in the case of The Navemar, supra, 303 U.S. 68, 58 S.Ct. 432, 82 L.Ed. 667, have left the ambassador to intervene personally. The language chosen, especially in the letter of November 22, 1940, bears out this inference. Not only had the Department earlier vouched for the truth of the "statements of fact" in the protest, as I have said, but in that letter it declared that "a prima facie case had been made" for immunity, and that "the interest of the Government of Brazil * * * is of such a character as to entitle" the funds to "immunity." I cannot read this otherwise than that the Department thought the issue important enough for the district court not to proceed.

I prefer this ground for affirmance to holding without more that each of the fed-

erated states of Brazil is immune from suit. Possibly that is true, for those states do indeed have large governmental powers; but so have many cities, and I should hesitate to hold that every political division was immune which exercised substantial governmental powers. It does not seem to me desirable, or indeed practicable, in every case to examine the municipal law of a foreign state in order to see how far the functions of one of its political divisions justify giving it immunity; nor indeed do I know any measure by which to judge that issue. Certainly, if the answer depends upon how far the suit will affect foreign relations, only our foreign office ought to decide it. If that office does not think that the foreign state's protest deserves transmission to its own court, I would not go at all into the question of the "sovereignty" of the political division of the foreign state. I know of no decision to the contrary unless it be In re Patterson-MacDonald Shipbuilding Co., 9 Cir., 293 F. 192, where before the Statute of Westminster the Commonwealth of Australia was a party to a bankruptcy proceeding; and there the court really begged the question by treating Australia as an independent state. All the other decisions cited in the majority opinion do not, I believe, touch the point. On the other hand, there are several decisions in French and Belgian courts which have entertained suits against the politicial divisions of a federation.